IAN K. BOYD (State Bar No. 191434)
E-Mail:        iboyd@sideman.com
ELLEN V. LEONIDA (State Bar No. 184194)
E-Mail:        *eleonida@sideman.com*
ANDREW M. LEVAD (State Bar No. 313610 )
E-Mail:        alevad@sideman.com
SIDEMAN & BANCROFT LLP
One Embarcadero Center, Twenty-Second Floor
San Francisco, California 94111-3711
Telephone:     (415) 392-1960
Facsimile:     (415) 392-0827

Attorneys for Defendant and Counterclaimant,
MDALGORITHMS, INC.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| LA CANADA VENTURES, INC., <br><br> Plaintiff and Counterdefendant, <br><br> v. <br><br> MDALGORITHMS, INC., <br><br> Defendant and Counterclaimant. | Case No. 22-cv-07197 RS <br><br> **DEFENDANT AND COUNTERCLAIMANT MDALGORITHMS, INC.'S MOTION FOR NEW TRIAL OR, IN THE ALTERNATIVE, TO AMEND OR ALTER JUDGMENT PURSUANT TO RULE 59** <br><br> Judge:        Richard Seeborg <br> Location:    Courtroom 12, 19th Floor <br> Date:         May 14, 2026 <br> Time:         1:30 p.m. |

12157-1\7795286

Case No. 22-cv-07197-RS

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

Please take notice that on May 14, 2026, at 1:30 p.m., the undersigned will appear before the Honorable Richard Seeborg of the United States District Court for the Northern District of California in Courtroom 12, 19th Floor, at the San Francisco Federal Courthouse, 450 Golden Gate Ave., San Francisco, CA 94102.  The motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities and the Declaration of Ian K. Boyd and exhibits thereto, any oral argument, and any other evidence the Court may consider.

DATED: April 2, 2026                    Respectfully submitted,

                                        SIDEMAN & BANCROFT LLP

                                        By:        /s/ *Ian K. Boyd*
                                        Ian K. Boyd
                                        Ellen V. Leonida
                                        Andrew M. Levad
                                        One Embarcadero Center, 22nd Floor
                                        San Francisco, CA 94111-3711
                                        Telephone: (415) 392-1960
                                        Facsimile: (415) 392-0827

                                        *Attorneys for Defendant and Counterclaimant*
                                        *MDalgorithms, Inc.*

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

**TABLE OF CONTENTS**

I.    INTRODUCTION.................................................................................................................1

II.   FACTUAL BACKGROUND .............................................................................................2

      A.    The Parties ...............................................................................................................2

            1.    MDalgorithms And Its Marks ......................................................................2

            2.    La Canada And Its Marks.............................................................................3

      B.    La Canada's Pre-Litigation Activities.....................................................................4

      C.    La Canada's Post-Lawsuit SEO Manipulation Tactics ...........................................4

      D.    La Canada's Deficient Evidence Of Actual Confusion ..........................................6

      E.    No La Canada Customers Experienced Any Confusion ..........................................8

      F.    Despite The Court's Admonition That This Is Not A Reverse Confusion
            Action, La Canada Framed This Case To The Jury As "David Versus
            Goliath" Whereby MDalgorithms "Flooded The Market".......................................8

      G.    La Canada Presented No Evidence Regarding The Value Of Its Trademarks...........9

      H.    The Jury Was Instructed Not To Overcompensate For Any Infringement .............10

      I.    La Canada's Damages Expert Was Impeached Regarding His Lost Profits
            Testimony...............................................................................................................10

III.  LEGAL STANDARD ......................................................................................................11

IV.   ARGUMENT ...................................................................................................................12

      A.    The Clear Weight of the Evidence Does Not Support a Finding of
            Likelihood of Confusion Under La Canada's Pleaded Forward-Confusion
            Theory ...................................................................................................................12

            1.    La Canada Impermissibly Skewed The Jury's Liability Analysis By
                  Trying This Forward-Confusion Case As A Reverse-Confusion Case........12

            2.    The Clear Weight of the Evidence Under the Sleekcraft Factors
                  Does Not Support the Jury's Finding of Likelihood of Confusion .............14

                  a.    *La Canada's actual confusion evidence was* de minimis *and,
                        properly weighed, did not support the verdict* ...............................14

                  b.    *The clear weight of the evidence shows that La Canada's md
                        marks are weak, both conceptually and commercially* ...................17

                  c.    *The clear weight of the evidence does not support an
                        inference of intent to copy* ............................................................19

LAW OFFICES

SIDEMAN & BANCROFT LLP

ONE EMBARCADERO CENTER, 22ND FLOOR

SAN FRANCISCO, CALIFORNIA 94111-3711

MDALGORITHMS, INC.'S RULE 59 MOTION FOR NEW TRIAL OR TO AMEND JUDGMENT

d.    *The clear weight of the evidence showed that the relevant consumers do not purchase these products on impulse* ...................19

e.    *The clear weight of the evidence shows that the similarity-of-the-marks, similarity of the goods, marketing channels and likelihood of expansion of product lines factors do not favor confusion* ........................................................................20

B.    The Willfulness Verdict Is Against the Clear Weight of the Evidence....................20

C.    The Damages Award Is Excessive, Against the Clear Weight of the Evidence, and Cannot Stand Under Rule 59 ...........................................................22

1.    The $1.9 Million Damages Award Cannot Be Reconciled With the Court's Instruction Not to Overcompensate.................................................22

2.    Any Damages Award Based on Alleged Injury to La Canada's Unregistered Marks Was Speculative and Unsupported............................23

D.    La Canada's Inequitable Conduct Further Demonstrates That Allowing the Verdict to Stand Would Work a Miscarriage of Justice..........................................24

V.    CONCLUSION .................................................................................................................25

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Chem. Corp. v. Daiflon, Inc.*,
    449 U.S. 33, 101 S. Ct. 188 (1980) ................................................................................ 11

*Antiaging Inst. of California, Inc. v. Solonova, LLC*,
    No. CV1503416ABFFMX, 2016 WL 6916817 (C.D. Cal. Sept. 21, 2016) .......................... 23

*Cairns v. Franklin Mint Co.*,
    24 F. Supp. 2d 1013 (C.D. Cal. 1998) ............................................................................. 16

*Dermfx, Inc. v. Obagi Med. Prods., Inc.*,
    No. SACV 15–01999 JVS, 2017 WL 2684548 (C.D. Cal. Mar. 24, 2017) ......................... 17

*E & J Gallo v. Proximo Spirits, Inc.*,
    2012 WL 273076 (E.D. Cal. Jan. 30, 2012) ...................................................................... 19

*Entrepreneur Media, Inc. v. Smith*,
    279 F.3d 1135 (9th Cir. 2002) ........................................................................................ 18

*Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*,
    762 F.3d 829 (9th Cir. 2014) .......................................................................................... 12

*Hanginout, Inc. v. Google, Inc.*,
    54 F. Supp. 3d 1109 (S.D. Cal. 2014) .............................................................................. 23

*Hard v. Burlington N.R.R.*,
    812 F.2d 482 (9th Cir. 1987) .......................................................................................... 11

*His & Her Corp. v. Shake>>N-Go Fashion Inc.*,
    No. 211CV05323CASVBKX, 2015 WL 13604255 (C.D. Cal. Apr. 6, 2015) ...................... 19

*Icon Enters. Int'l, Inc. v. Am. Prods. Co.*,
    No. CV 04-1240 SVW PLAX, 2004 WL 5644805, at *13 (C.D. Cal. Oct. 7,
    2004) ............................................................................................................................. 15

*Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. KGAA v. New Millennium
    Sports, S.L.U.*,
    797 F.3d 1363 (Fed. Cir. 2015) ...................................................................................... 18

*Japan Telecom, Inc. v. Japan Telecom Am. Inc.*,
    287 F.3d 866 (9th Cir. 2002) .......................................................................................... 24

*Juice Generation, Inc. v. GS Enters. LLC*,
    794 F.3d 1334 (Fed. Cir. 2015) ...................................................................................... 18

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

MDALGORITHMS, INC.'S RULE 59 MOTION FOR NEW TRIAL OR TO AMEND JUDGMENT

*Landes Construction Co., Inc. v. Royal Bank of Canada*,
833 F.2d 1365, 1371 (9th Cir.1987)........................................................................ 11, 12

*Lerner & Rowe PC v. Brown Engstrand & Shely LLC*,
119 F.4th 711 (9th Cir. 2024)................................................................................. 15, 16

*Lindy Pen Co. v. Bic Pen Corp.*,
982 F.2d 1400 (9th Cir. 1993).......................................................................... 20, 21, 22

*M2 Software, Inc. v. Madacy Ent.*,
421 F.3d 1073 (9th Cir. 2005)................................................................................ 12, 18

*Miss World (UK) Ltd. v. Mrs. Am. Pageants, Inc.*,
856 F.2d 1445 (9th Cir. 1988)...................................................................................... 18

*Molski v. M .J. Cable, Inc.*,
481 F.3d 724 (9th Cir. 2007)................................................................................... 11, 12

*Montgomery Ward & Co. v. Duncan*,
311 U.S. 243 (1940) ..................................................................................................... 11

*Moroccanoil, Inc. v. Moroccan Gold, LLC*,
590 F. Supp. 2d 1271 (C.D. Cal. 2008)........................................................................ 19

*Murphy v. City of Long Beach*,
914 F.2d 183 (9th Cir. 1990)................................................................................... 11, 14

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*,
638 F.3d 1137 (9th Cir. 2011)...................................................................................... 19

*Perfumebay.com Inc. v. eBay, Inc.*,
506 F.3d 1165 (9th Cir. 2007)...................................................................................... 25

*Rearden LLC v. Rearden Com., Inc.*,
683 F.3d 1190 (9th Cir. 2012)...................................................................................... 18

*Redken Lab'ys, Inc. v. Clairol, Inc.*,
501 F.2d 1403 (9th Cir. 1974)...................................................................................... 19

*Ritz Hotel, Ltd. v. Shen Mfg. Co.*,
No. CIV. A. 05-4730, 2009 WL 1838357 (E.D. Pa. June 25, 2009) ...................................... 13

*Scat Enterprises, Inc. v. FCA US LLC*,
No. CV 14-7995-R, 2017 WL 5896182 (C.D. Cal. June 8, 2017)......................................... 16

*Theia Techs. LLC v. Theia Grp., Inc.*,
No. CV 20-97, 2021 WL 291313 (E.D. Pa. Jan. 28, 2021)...................................................... 13

*Threshold Enters. Ltd. v. Pressed Juicery, Inc.*,
445 F. Supp. 3d 139 (N.D. Cal. 2020) ................................................................................. 18

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

*Zhang v. Am. Gem Seafoods, Inc.*,
    339 F.3d 1020 (9th Cir. 2003) ...................................................................................................... 11

**Other Authorities**

3 McCarthy on Trademarks and Unfair Competition § 23:10, *Reverse confusion*
    (5th ed.) .......................................................................................................................................... 13

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

## I.    INTRODUCTION

The verdict in this action should not stand and a new trial is appropriate under Rule 59. The trial evidence overwhelmingly demonstrates that MDalgorithms, Inc. ("MDalgorithms") did not infringe La Canada Ventures, Inc.'s ("La Canada") weak MD-formative trademarks, and in no event is a finding of willful infringement or the grossly excessive $1.9 million damages award consistent with the clear weight of the evidence.

The verdict rests in large part on a theory this Court already rejected. Although La Canada was obligated to put forth a forward confusion theory, it urged the jury to decide the case through a reverse confusion lens—emphasizing MDalgorithms' "Goliath"-like size, eight-figure funding, and alleged ability to "flood the market," while La Canada portrayed itself as "David" and a "small company" that was "just trying to get by" against the onslaught of MDalgorithms and its advertising. That framing skewed the jury's analysis of the core *Sleekcraft* factors, all while La Canada failed its burden to prove forward confusion. Once that improper lens is removed, the verdict cannot be reconciled with the pleaded legal theory and evidence presented at trial.

La Canada's "proof" of actual confusion underscores the deficiency in its case. The trial revealed that La Canada based its claimed actual confusion on its assumption that any person who contacted La Canada who was not already in its customer database must have been an MDalgorithms customer, and a confused one at that, even where the communication was simply "Hi!" or otherwise contained no indicia of any connection to MDalgorithms, or, indeed, confusion at all. La Canada's alleged confusion evidence does not support the verdict. It contradicts it.

The verdict on willfulness and damages is similarly untenable. La Canada presented no evidence that MDalgorithms acted in bad faith or sought to trade on La Canada's goodwill in a crowded field dominated by the descriptive "MD" term on personal care products associated with medical doctors. But the jury found willfulness and awarded $1.9 million in damages anyway, despite La Canada's own (impeached) damages expert identifying only $33,105 in alleged past lost profits and no present or future losses, the Court's instruction that the jury "must not overcompensate," and La Canada's absolute failure to establish any common law trademark rights. Allowing that award to stand—particularly where La Canada engaged in conduct that created or

MDALGORITHMS, INC.'S RULE 59 MOTION FOR NEW TRIAL OR ALTERED JUDGMENT

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

amplified the very confusion it claims, as confirmed by Dr. Lin's impeached testimony—would be a manifest miscarriage of justice.

Rule 59 exists to prevent precisely this result. The Court should either grant a new trial or alter or amend the judgment to vacate or substantially reduce the damages award and conform the judgment to the evidence actually presented at trial.[1]

## II.    FACTUAL BACKGROUND

### A.    The Parties

#### 1.    MDalgorithms And Its Marks

The evidence at trial established that MDalgorithms is a health- and beauty-tech company that utilizes its proprietary technology applying image analysis and AI to customize skin and hair treatment kits based on the customers' specific needs. Declaration of Ian K. Boyd In Support Of MDalgorithms' Motion For New Trial ("Boyd Decl.") ¶ 3, Exhibit ("Ex.") A,[2] at 363:20-364:10; *see also* EX2034. MDalgorithms offers these skincare and haircare products and services under the marks MDacne (beginning in 2017) and MDhair (beginning in 2021), respectively. Tr. at 364:11-13; 381:24-25; PX-1065; PX-1066.

The testimony at trial established that MDalgorithms' customers typically begin by uploading photographs of their skin (for MDacne) or scalp (for MDhair) and completing a detailed questionnaire regarding their symptoms, medical history, lifestyle factors, and treatment goals. MDalgorithms' proprietary image-analysis tools and algorithms evaluate this information to generate individualized product recommendations. Tr. 364:17-365:25; EX2034. Customers then receive customized treatment kits formulated to address their specific needs, along with ongoing guidance designed to adjust treatment over time. *Id.* This individualized diagnostic and fulfillment model distinguishes MDalgorithms' offerings from conventional off-the-shelf personal care products. Tr. 391:21-392:22. From January 2022 to August 2025, MDalgorithms distributed

---

[1] MDalgorithms has concurrently filed a Motion for JMOL under Rule 50(b) and strongly urges the Court to grant that motion. Yet even if the Court does so, it should still rule on this new trial motion. FRCP 50(c)(1).

[2] This Exhibit is a true and correct excerpt of the trial transcript, and citations to the "Tr." refer to this Exhibit.

over 290,000 shipments of MDhair product in the United States to its customers.  Tr. 463:10-18.

MDalgorithms owns trademark registrations for the marks MDacne in Classes 03, 05, 09, and 41 (Reg. Nos. 4,946,004; 5,519,511; and 6,668,393) and MDhair in Class 42 (Reg. No. 6,617,014).  PX-1065; PX-1066.

### 2.    La Canada And Its Marks

The evidence at trial established that La Canada is a health and beauty company that claims to offer a variety of products to assist with skincare, stress, haircare, sexual wellness, weight loss, detoxification, and eyelash growth, under a variety of MD-formative trademarks.  La Canada's sole employee is Cassandra Havea, who handles all customer service, fulfills orders, and, for purposes of this litigation, created and maintained a "log" of all individuals whom she assumed to be MDalgorithms' customers who contacted La Canada by mistake regarding MDalgorithms' MDhair products.  Tr. 280:21-25, 281:1-15.

Dr. Lin, in her individual capacity, applied to register numerous MD-formative trademarks.[3]  In each of these applications, Dr. Lin represented that she was the individual owner of the marks.  *Id.*  During her testimony, Dr. Lin attempted to manufacture a distinction between "M.D." and "MD" based solely on punctuation—first insisting that only "M.D." signifies a medical doctor; then conceding that at least some consumers might understand "MD" the same way; and then, when confronted with the USPTO's statements that "MD" (without periods) is an abbreviation for "medical doctor," retreating to an assertion that the USPTO had adopted a "different interpretation" between applications.  *See*, *e.g.*, Tr. at 186:2-14, 203:2-204:1, 223:11-24, 227:12-21, 241:14-25, 258:17-260:16.  Dr. Lin's initial attempts to assert a material difference between "MD" and "M.D.," to try to support that "MD" could serve as a source identifier because people would not know what "MD" means, should factor into her credibility as a witness.

The evidence ultimately established that many of these applications were refused or required disclaimers on the grounds that "MD" and "M.D." are abbreviations of "medical doctor," rendering the applied-for marks merely descriptive of products associated with a medical doctor.

---

[3] *See* U.S. Trademark App. Serial Nos. 77145259; 77295098; 85573473; 77823740; 77824960; 86051415; 88055090; 88055081; 88121311; and 88158652.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

MDALGORITHMS, INC.'S RULE 59 MOTION FOR NEW TRIAL OR TO AMEND JUDGMENT

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

Specifically, her applications for MD HAIR RESTORATION SYSTEM, SUSAN F. LIN M.D., MD FACTOR, MD WELLNESS BY SUSAN F. LIN M.D., MD BEAUTY, and MD BY SUSAN F. LIN M.D. were refused on this basis.[4]

### B.    La Canada's Pre-Litigation Activities

La Canada's witnesses testified that La Canada first learned of MDalgorithms in or around April 2022, when a customer from Canada contacted La Canada inquiring about MDalgorithms' MDhair product. Tr. 281:16-18. On June 21, 2022, La Canada for the first time began recording alleged instances of customer inquiries in a spreadsheet. PX-1020. Thereafter, La Canada sent a cease-and-desist communication to MDalgorithms asserting that consumer confusion was occurring and demanding that MDalgorithms cease use of MDacne and MDhair. PX-1017. The evidence at trial showed that when MDalgorithms declined to do so, La Canada escalated its efforts by reporting MDalgorithms' use of MDacne to online platforms, alleging infringement in connection with MDalgorithms' MDacne® products offered through Amazon and the MDalgorithms' MDacne® mobile application offered via the Apple App Store. Tr. 454:17-455:10. Due solely to La Canada's claim that the use of MDacne infringed La Canada's trademark rights, Amazon de-listed the MDacne products, depriving MDalgorithms of revenue during the takedown period. *Id.* The baseless nature of these attacks was confirmed when the Court dismissed La Canada's claims as to MDacne. Dkt. 98.

### C.    La Canada's Post-Lawsuit SEO Manipulation Tactics

On November 16, 2022, La Canada sued MDalgorithms for trademark infringement and unfair competition as to MDalgorithms' use of MDacne and MDhair. Dkt. 1. Written communications between Dr. Lin and Ms. Havea admitted at trial established that five months later, in April 2023, Ms. Havea emailed Dr. Lin that MDalgorithms utilized the domain <mdhair.co> to market its MDhair products. EX2044. Dr. Lin's testimony confirmed that just days after receipt of this email, Dr. Lin chose to activate the domain <mdhair.<u>com</u>> and redirect it

---

[4] Undisputed USPTO records show that La Canada also separately filed trademark applications for MD-formative marks that were refused on this same basis that "MD" is merely descriptive of a medical doctor, including applications for MD NUTRI HAIR BY SUSAN F. LIN M.D. (App. Serial No. 85640282) and MD INTIMATE FRESH (App. Serial No. 88506548).

to La Canada's own website, despite La Canada never having used that domain in any way for almost a decade before the litigation. EX2080. This domain redirection for <mdhair.com> was in place from April 2023 to September 2024. Tr. 175:10-12.

Dr. Lin testified that she started the redirect "to extend my brand" but stopped the redirect in September 2024 allegedly "because [MDalgorithms] were making a big stink about it." Tr. at 172:8; 176:10-12. To find this testimony credible, one would have to believe that Dr. Lin would not seek to grow her business if a purported competitor (one she had in fact sued) simply complained.

That La Canada's customers had no reason to look for La Canada at <mdhair.com> was confirmed by Dr. Lin's testimony that the use of this redirect did not result in <u>any</u> sales revenue increase for La Canada over a 17-month period and that La Canada never promoted its products as being available at <mdhair.com>. Tr. at 172:10-12. The redirect only resulted in a spike in the number of claimed inquiries.

Dr. Lin's alleged concerns about MDalgorithms' "making a big stink" over her use of <mdhair.com> were short lived, for by no later than January 2026, La Canada put up new content at <mdhair.com>, with a 2026 copyright date, stating that something was "Launching Soon." The website now makes no reference to La Canada or any La Canada products. Tr. 468:25-470:1. This conduct makes it very difficult for Dr. Lin to assert that such use of <mdhair.com> is "extending" La Canada's brand when that site now makes no mention of La Canada's brand.

The evidence at trial further showed that in July 2023, eight months after suing MDalgorithms over the MDacne trademark, La Canada purchased the domains <mdacne.<u>net</u>> and <mdacne.info>, and caused <mdacne.<u>net</u>> to redirect to La Canada's own website. MDalgorithms has long held a federal trademark registration for MDacne® and, as Dr. Lin was well aware from the litigation, had offered its own products at <mdacne.<u>com</u>> for almost six years before Dr. Lin acquired <mdacne.<u>net</u>> and <mdacne.info>. Tr. 179-7-16.

Dr. Lin testified at trial that she bought <mdacne.<u>net</u>> in 2023 and redirected it to La Canada's website to "save her brand" but nonetheless stopped the redirect just before trial because "I know that they're going to make a big stink about it." Tr. at 179:9-180:4; 181:2-5; 197:5-198:4.

MDALGORITHMS, INC.'S RULE 59 MOTION FOR NEW TRIAL OR TO AMEND JUDGMENT

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

Again, to find this testimony credible, one would have to believe that Dr. Lin would abandon an attempt to "save her brand" if a party she had sued simply complained about the redirect. And there are further reasons to not find this testimony credible. Dr. Lin's trial testimony here was directly contradicted and impeached by her January 2024 deposition testimony, when she testified (falsely) that she bought the <mdacne.net> domain between <u>five to ten years ago</u> and that <mdacne.net> did not redirect to La Canada's website (when it did). Boyd Decl. ¶ 4, Ex. B, at p. 92:16-93:13. In truth, and as Dr. Lin was forced to concede at trial, she had acquired <mdacne.<u>net</u>> and <mdacne.info> only six months before her January 2024 deposition. Tr. 179:7-180-4.

Between her deposition and trial testimony, Dr. Lin gave dramatically conflicting accounts, and was objectively not credible, concerning when she acquired <mdacne.<u>net</u>> and <mdacne.info>, how and why she acquired them, how she used <mdacne.<u>net</u>>, and why she stopped that domain redirection. The Court should draw the appropriate inference as to why Dr. Lin actually acquired and activated <mdacne.<u>net</u>>, and why she turned off that redirect on the eve of the jury trial in February 2026, when MDalgorithms had been "complaining" about this use for two years since discovering it at Dr. Lin's January 2024 deposition.

### D.    La Canada's Deficient Evidence Of Actual Confusion

La Canada's purported evidence of "actual confusion" at trial consisted of internal spreadsheets created and maintained by its sole employee, Cassandra Havea, and screen-captures of electronic communications from individuals (or, in some cases, apparent bots) to La Canada's customer service inboxes, also maintained by Ms. Havea. PX-1020, PX-1024, Amended PX-1030; Tr. at 271:24-272-5. Ms. Havea testified that she is responsible for La Canada's customer service communications and that she created and maintained the spreadsheets during the relevant period as a record of what La Canada contends were instances of MDalgorithms' customers mistakenly contacting La Canada and expressing actual confusion as to the source of MDalgorithms' MDhair products. *Id.*

Ms. Havea's records contain 377 total entries of purported actual confusion from January 2022 to August 2025. PX-1024. The overwhelming majority of these spreadsheet entries contain

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

only brief and vague descriptions such as "I have proof in my email" or "proof in shopify account" without any corroborating underlying communications. *See* PX-1020, PX-1024.

The "proof" referenced in Ms. Havea's spreadsheets was produced as an exhibit in a new 517-page exhibit described as an "amended" PX-1030. La Canada provided this 517-page document to MDalgorithms for the first time while the parties were in court during trial. This exhibit purported to compile the underlying email and Shopify communications from Ms. Havea's accounts that allegedly corresponded to the spreadsheet entries La Canada previously identified as evidence of confusion. *See* Amended PX-1030. It revealed that the overwhelming majority of the underlying communications that Ms. Havea logged as evidence of actual confusion with MDalgorithms did not reference MDalgorithms, MDhair, or any MDalgorithms product at all. Many communications—approximately 180 of them—consisted of brief or unrelated inquiries such as "Hi!" (*id.* at LCV0006561) or routine customer service requests such as password resets (*id.* at LCV0006489-90). Other communications asked about products neither party offers, such as "MD Complexation" (*id.* at LCV0006182) or hair spray (*id.* at LCV0006254).

Indeed, despite La Canada's repeated characterization of its evidence as showing "377" customers actually confusing La Canada with MDalgorithms, a review of the actual document confirms that 304 of the actual communications (81% of them) contain no reference to MDalgorithms, MDhair, or any MDalgorithms product, and, as such objectively do not support La Canada's burden to establish actual confusion with MDalgorithms.

MDalgorithms reviewed numerous examples of such underlying communications with Ms. Havea. Tr. at 284:16-295:18. When asked why these communications had been logged as purported instances of confusion involving MDalgorithms' MDhair customers, Ms. Havea testified that she did not rely on any statement from the customer indicating they believed MDalgorithms' products were affiliated with La Canada. Instead, she simply checked whether the individual appeared in La Canada's customer database, and if the person's exact name did not appear, she "assumed" that the individual was an MDalgorithms MDhair customer and recorded the interaction as a "confusion" entry:

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

MDALGORITHMS, INC.'S RULE 59 MOTION FOR NEW TRIAL OR TO AMEND JUDGMENT

Q.  So if they didn't order from La Canada, you assumed they were looking for MDhair?

A.  Yes.

Tr. at 286:12-14.  MDalgorithms confirmed with Ms. Havea several times that she merely assumed that <u>any</u> person who contacted La Canada but whom she was not able to immediately identify in La Canada's database must, *ipso facto*, be a confused MDalgorithms customer.  *See*, *e.g.*, Tr. at 288:11-16; 289:13-18; 290:22-25, 291:1-4; 292:9-12; 292:24-25, 293:2-4.

According to La Canada's own Amended PX-1030, of the 377 instances that La Canada presented as evidence of actual consumer confusion, only <u>73</u> of the underlying communications, *i.e.*, <u>19%</u> of them, actually contained indicia of a MDalgorithms customer, such as a photograph, invoice or other information suggesting they had purchased MDalgorithms' MDhair product. Furthermore, of those 73 communications with indicia of a true MDalgorithms customer, <u>50</u> of them occurred during the period when La Canada was redirecting <mdhair.com> to La Canada's website—in other words, <u>over two-thirds</u> of those customers contacted La Canada about MDhair while La Canada was actively redirecting internet traffic from <mdhair.com> to its own website. In addition, of the 73 communications indicating an actual MDalgorithms customer, <u>only 41</u> were confirmed to originate from within the U.S., all during a time when MDalgorithms had over 290,000 shipments to U.S. customers.

### E.  No La Canada Customers Experienced Any Confusion

Belying its forward confusion claim, La Canada's testimony confirmed that La Canada's own customers experienced zero confusion at all during the relevant period:

Q.  So no La Canada customers called you and were confused?

A.  No.

Tr. at 282:6-7.

### F.  Despite The Court's Admonition That This Is Not A Reverse Confusion Action, La Canada Framed This Case To The Jury As "David Versus Goliath" Whereby MDalgorithms "Flooded The Market"

In granting MDalgorithms' Motion for Partial Summary Judgment, the Court rejected La Canada's belated attempt to advance a reverse confusion claim because La Canada did not plead

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

that theory in the operative complaint. *See* Dkt. 98, 4:17-19. During trial, the Court reiterated its position by agreeing with MDalgorithms' counsel that La Canada was not permitted to advance reverse confusion as a theory of liability. Tr. at 533:25-536:10.

However, La Canada's damages expert (who was also impeached, as shown below) testified that the circumstances of this action presented "a David and Goliath situation" in his assessment of damages:

> Q. So how would you come up with your number as to a corrective advertising number?
>
> A. [W]e kind of have a David and Goliath situation where we have La Canada as a senior user of this trademark, is my understanding, and they've been spending about 300,000 a year in recent years for advertising, then comes along MDalgorithms and they're spending in the order of ten times or more than La Canada.

Tr. at 510:12-511:4.

> Q. You referred to this litigation as a David versus Goliath matter. Who do you consider to be the Goliath?
>
> A. MDalgorithms.

Tr. at 524:10.

Furthermore, in closing argument, and in stark contrast to the allegations in its pleading asserting that "MD has come to be associated with La Canada in the minds of consumers as a source of high quality health and beauty products" (*see* Dkt. 31 at ¶ 12), La Canada urged the jury to find for La Canada based on an explicit reverse confusion narrative, arguing that MDalgorithms used its $9.2 million in funding to "flood the market," overpower La Canada's smaller advertising efforts where La Canada was "just trying to get by," and saturate the marketplace with MDalgorithms' MDhair mark:

> What are you supposed to do? How are you supposed to compete with the $9.2 million — it's not even their money really — that they're using to flood the market here with an infringing mark.

Tr. at 725:17:20; *see also* Tr. at 724:12-25, 725:14-20, 726:8-12.

**G.    La Canada Presented No Evidence Regarding The Value Of Its Trademarks**

Throughout trial, La Canada presented <u>zero</u> evidence regarding the commercial value of its

asserted trademarks.  It offered no testimony, documents, or expert analysis quantifying any goodwill, brand equity, or marketplace recognition attributable to its marks, nor any evidence tying such purported value to the damages it sought.  This means it also offered <u>zero</u> evidence supporting any claimed common law trademark rights in MD Hair, MD Nutri Hair, or MD Nutri Hair by Susan F. Lin M.D., including sales figures, advertising spend, area of geographic distribution, length of use, exclusivity of use, or consumer recognition as to these claimed trademarks.  Instead, La Canada presented only generalized oral assertions of advertising spend and business activity that was not tied to its claimed MD Hair trademark, nor verified or consistent with any admitted exhibits.  The only financial documentation provided concerning La Canada established that the company generally operated at a significant net loss prior to MDalgorithms' introduction of MDhair in late 2021.  Tr. at 239:10-240:10.

**H.    The Jury Was Instructed Not To Overcompensate For Any Infringement**

Per the Ninth Circuit Manual of Model Jury Instructions, Instruction No. 15.29, and 15 U.S.C. § 1117(a), the jury was instructed not to overcompensate La Canada for any infringement they found.  Dkt. 202 at 30.  Specifically, they were instructed:

> When considering prospective costs (*e.g.,* cost of future advertising, expense of preventing customers from being deceived), you must not overcompensate. Accordingly, your award of such future costs <u>should not exceed the actual damage</u> to the value of the Plaintiff's mark at the time of the infringement by the Defendant.

*Id.* (emphasis added).  Again, the "actual damage" put forth by La Canada's own damages expert was just over $33,000 in claimed lost profits, meaning that the jury should not have awarded a total remedy exceeding $66,000.  Yet it awarded $1.9 million.  This award, in express disregard of the instruction, and instead apparently centered on the investments received by MDalgorithms (as urged by La Canada in closing), only further confirms a miscarriage of justice.

**I.    La Canada's Damages Expert Was Impeached Regarding His Lost Profits Testimony**

At trial, La Canada's damages expert testified that he did not calculate any lost profits for 2025, but could not rule them out, because he lacked complete 2025 data and therefore "decided to be conservative and cut it off at 2024."  *See* Tr. 528:13–25.  That testimony, which invited the jury

LAW OFFICES

SIDEMAN & BANCROFT LLP

ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

to still award future lost profits, directly contradicted his prior deposition testimony that he definitively ended his profits analysis with 2024 not because of incomplete data, but because La Canada's actual revenues for hair and lash products, by that point, "had recovered to the point that it would have been but for MDalgorithms' actions." Boyd. Decl. ¶ 5, Ex. C at 64:13-65:4.

## III.   LEGAL STANDARD

"A new trial may be granted . . . in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." F.R.C.P. 59(a). "Rule 59 does not specify the grounds on which a motion for new trial may be granted." *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003). Rather, the court is "bound by those grounds that have been historically recognized." *Id.* Such historically recognized grounds upon which a new trial may be granted include (1) that a verdict that is contrary to the weight of the evidence, (2) that a verdict that is based on false or perjurious evidence, or (3) to prevent a miscarriage of justice. *Molski v. M .J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007). Additional grounds for a new trial exist if "the damages are excessive, or . . . for other reasons, the trial was not fair to the party moving." *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940); *Molski*, 481 F.3d at 729.

The grant of a new trial is "confided almost entirely to the exercise of discretion on the part of the trial court." *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36, 101 S. Ct. 188, 191 (1980). The trial court's decision, therefore, will not be reversed absent a showing of abuse of discretion. *See Hard v. Burlington N.R.R.*, 812 F.2d 482, 483 (9th Cir. 1987).

In the Ninth Circuit, district court judges have both "the right" and "the duty" to set aside improper verdicts. *See Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990) ("It is clear that the district judge had the right, and indeed the duty, to weigh the evidence as he saw it, and to set aside the verdict of the jury, even though supported by substantial evidence, where, in his conscientious opinion, the verdict is contrary to the clear weight of the evidence, or . . . to prevent, in the sound discretion of the trial judge, a miscarriage of justice"); *see also Landes Construction Co., Inc. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir.1987) ("The existence of substantial evidence does not . . . prevent the court from granting a motion for a new

trial pursuant to Fed. R. Civ. P. 59 if the verdict is against the clear weight of the evidence.").

In ruling on a new trial motion, the Court should not presume that the verdict is correct, nor need it view the evidence in the light most favorable to the prevailing party. *Landes*, 833 F.2d at 1371; *see also Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*, 762 F.3d 829, 842 (9th Cir. 2014); *Molski*, 481 F.3d at 729 ("[t]he judge can weigh the evidence and assess the credibility of witnesses, and need not view the evidence from the perspective most favorable to the prevailing party").

Finally, the court is not limited to the grounds a party asserts to justify a new trial, but may *sua sponte* raise its own concerns about a verdict. *Id.* In sum, the court can grant a new trial under Rule 59 on "any ground necessary to prevent a miscarriage of justice." *Id.* (citing *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir.1990)).

## IV.    ARGUMENT

### A.    The Clear Weight of the Evidence Does Not Support a Finding of Likelihood of Confusion Under La Canada's Pleaded Forward-Confusion Theory

#### 1.    La Canada Impermissibly Skewed The Jury's Liability Analysis By Trying This Forward-Confusion Case As A Reverse-Confusion Case

La Canada's incorporation of reverse confusion elements and arguments into this case fatally distorted the jury's liability analysis and warrants a new trial or modified judgment under Rule 59. As this Court ruled prior to trial, La Canada did not plead a reverse confusion theory and therefore could not try the case on that basis. Dkt. 98 at 4:17-19. The Court reaffirmed that limitation during trial, agreeing with MDalgorithms' counsel that this case must be tried under a forward confusion framework. Tr. at p. 536:5-10. Yet despite these rulings, La Canada framed its case to the jury as one of reverse confusion, *i.e.*, that the larger, better-funded junior user "flooded the market" with its massive advertising spend and overwhelmed the smaller senior user.

La Canada's own evidence and argument centered not on the strength of its own marks as the senior user, which is the relevant inquiry in a forward confusion case, but on the purported commercial strength of the junior user MDalgorithms' marks. *M2 Software, Inc. v. Madacy Ent.*, 421 F.3d 1073, 1089 (9th Cir. 2005) ("[I]n reverse confusion cases, the inquiry focuses on the strength of a junior mark.").

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

La Canada emphasized MDalgorithms' eight-figure funding (with detailed inquiries into MDalgorithms' SAFE contracts with its investors), advertising expenditures, and marketplace reach, repeatedly pointing to MDalgorithms' $9.2 million marketing investment and contrasting it with La Canada's comparatively modest claimed marketing spend. *E.g.*, Tr. at 111:2-6, 113:20-24, 307:13-14, 381:15-16, 396:7-20, 510:15-511:9, 724:14-25.

La Canada's own damages expert referred to La Canada as a "small company" and framed the case as "David versus Goliath," identifying MDalgorithms as the "Goliath." That theory is quintessential reverse confusion. *Compare* Tr. at pp. 510:12-511:4 ("[W]e kind of have a David and Goliath situation.") *and*, *e.g.*, *Theia Techs. LLC v. Theia Grp., Inc.*, No. CV 20-97, 2021 WL 291313, at *22 (E.D. Pa. Jan. 28, 2021) ("Reverse confusion protects David's trademarks against an encroaching Goliath.") (emphasis added).

In its closing argument, La Canada urged the jury to find a likelihood of confusion based on the notion that MDalgorithms had "flooded the market" with its mark—also textbook reverse confusion. *Compare* Tr. at p. 725:17:20 ("How are you supposed to compete with the $9.2 million . . . that they're using to flood the market here with an infringing mark.") *and*, *e.g.*, *Ritz Hotel, Ltd. v. Shen Mfg. Co.*, No. CIV. A. 05-4730, 2009 WL 1838357, at *8 (E.D. Pa. June 25, 2009) ("Trademark infringement by 'reverse confusion' occurs when a larger, more powerful junior registrant or non-registrant with a stronger mark floods the relevant market with its own goods") (emphasis added); *see also* 3 McCarthy on Trademarks and Unfair Competition § 23:10, *Reverse confusion* (5th ed.) ("A reverse confusion case is proven only if the evidence shows that the junior user was able to swamp the reputation of the senior user with a relatively much larger advertising campaign.").

La Canada's focus on MDalgorithms' investors, marketing spend, revenue, and market presence, while neglecting to offer any evidence of its own market spend, revenue or market presence, reflected a deliberate shift to the wrong legal framework, seeking to elicit sympathy instead of proving its forward confusion claim. And that improper shift is dispositive, as confirmed by the damages award. By urging the jury to evaluate confusion based on the commercial strength of the junior mark as it "flooded" the market, La Canada shelved its burden

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

MDALGORITHMS, INC.'S RULE 59 MOTION FOR NEW TRIAL OR TO AMEND JUDGMENT

to prove forward confusion and betrayed its pleading, all to now suddenly portray itself as the underdog.[5]  Critically, La Canada presented no evidence satisfying its actual burden—La Canada offered <u>no</u> evidence that MDalgorithms' customers believed MDhair products originated from or were affiliated with <u>La Canada</u>.  Tr. at pp. 534:11-535:8.  To the contrary, La Canada's own testimony confirmed that none of its customers were confused.  Tr. at 282:6-7.

Under Rule 59, the Court has a "right" and a "duty" to reject a verdict reached through that improper lens.  *Murphy*, 914 F.2d at 187.  Once La Canada's improper reverse-confusion framing is set aside, the verdict cannot be reconciled with the evidence.  The clear weight of the evidence in no way supports a finding of likelihood of confusion under the only theory La Canada was permitted to pursue, warranting a new trial.

**2.    The Clear Weight of the Evidence Under the Sleekcraft Factors Does Not Support the Jury's Finding of Likelihood of Confusion**

**a.    *La Canada's actual confusion evidence was* de minimis *and, properly weighed, did not support the verdict***

La Canada's claimed actual confusion showing did not merely fall short; properly weighed under Rule 59, it affirmatively undermines the verdict.  The Court need not and should not accept La Canada's characterization of its proof at face value or viewed through the lens most favorable to the verdict.  The Court should evaluate the quality, reliability, and weight of the evidence itself, and as it does, this factor weighs heavily against any finding of a likelihood of confusion.

The overwhelming majority of La Canada's "confusion" evidence was not evidence of confusion with MDalgorithms, forward or otherwise.  Of the 377 inquiries La Canada presented as purported instances of actual confusion, <u>only 73</u> contained any indicia that the person contacting La Canada was in fact an MDalgorithms customer.  The other 304 entries—more than 80% of the total—did not identify MDalgorithms, MDhair, or any MDalgorithms product, but instead were logged by Ms. Havea as confused customers based on her "assumption" that if the person was not

---

[5] La Canada further distorted the proper legal framework in closing, telling the jury:  **"**And remember, the question is is it more likely than not that confusion is going to continue.  That's the question."  Tr. at p. 689:2-5 (emphasis added).  As La Canada knew from its clever wordplay, that is not the legal test.  In a case already built on improper reverse-confusion themes and weak confusion evidence, that misstatement materially increased the risk of a verdict based on the wrong legal standard.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

in La Canada's system, that person *ipso facto* was a confused MDalgorithms customer. That is not evidence of actual confusion. *Icon Enters. Int'l, Inc. v. Am. Prods. Co.*, No. CV 04-1240 SVW PLAX, 2004 WL 5644805, at \*13 (C.D. Cal. Oct. 7, 2004) ("[A]ctual confusion evidence must show <u>actual</u> confusion") (collecting cases) (emphasis in original). It is, at most, speculation layered onto customer-service noise.

Even taking La Canada's evidence at face value (which this Court should not do, in making its own assessment), the numbers remain *de minimis*. MDalgorithms' CEO testified that the company sold over 290,000 MDhair shipments in the U.S. during the relevant period. Tr. 463:10-18. Using the face of La Canada's own proof (Amended Tr. Ex. 1030), the number is not 377, but, at most, 73, *i.e.*, the number of inquiries that actually contained indicia of an MDalgorithms customer. That yields a confusion rate of approximately <u>0.025%</u> (73/290,000). And the actual figure is lower still if the Court appropriately considers only the relevant domestic market. Of the 73 inquiries with indicia of an actual MDalgorithms customer, only 41 were confirmed to originate in the U.S. That yields a confusion rate of approximately <u>0.014%</u> (41/290,000). Even affording La Canada credit for all 377 claimed instances (which would be wholly unreasonable based on La Canada's own submitted evidence), that number is 0.13% (377/290,000). As the Court noted previously, "evidence of this purported confusion [as to MDhair] is exceedingly minimal such that no triable issue of fact is created, as consumer inquiries for MDhair represented not even 1% of Defendant's total U.S. sales." Dkt. 98, 6:12-14. The trial evidence only confirmed that this number was well under 1%.

A subsequent Ninth Circuit decision that issued after the Court's August 2, 2024, order granting partial summary judgment to MDalgorithms as to the MDacne mark (Dkt. 98, hereinafter, the "MPSJ Order") only further confirmed that the Court's analysis was squarely on point. In *Lerner & Rowe PC v. Brown Engstrand & Shely LLC*, 119 F.4th 711, 719-20 (9th Cir. 2024), the Ninth Circuit affirmed summary judgment for the defendant where the plaintiff's "proffer of actual confusion consists of 236 phone calls" received by the plaintiff during the time period when the relevant search results featuring the disputed advertisement were searched 109,322 times. "The resulting 0.216% confusion rate [236 numerator / 109,322 denominator] is direct evidence of

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

the likelihood of confusion comparable to, but more complete than, survey evidence. No reasonable jury would conclude that this [0.216%] percentage is anything but *de minimis* and fails to support a finding of likelihood of confusion." *Id.* at 720 (emphasis added).  Here, under any possible numerator La Canada can claim—41, 73, or 377—the real-life alleged (forward or reverse) confusion rate under La Canada's own evidence remains *de minimis*, well under 1% of MDalgorithms' sales, and "fails to support a finding of likelihood of confusion." *Id.*

As *Lerner* found, *de minimis* confusion evidence can "affirmatively contradict[]" the plaintiff's contention that an appreciable number of consumers are likely to be confused, such that the actual confusion factor weighs substantially in the defendant's favor.  119 F.4th at 722.  That is what occurred here.  La Canada's proffer of actual confusion did not constitute actionable evidence of marketplace confusion.  Rather, it presented a handful of trace incidents, most of which showed no association with MDalgorithms, in the face of hundreds of thousands of shipments by MDalgorithms.  On this record, the clear weight of the evidence shows that La Canada's actual confusion evidence is insufficient and does not support a finding of a likelihood of confusion.

Tellingly, La Canada elected not to conduct a consumer survey, despite bearing the burden of proving likelihood of confusion and possessing the resources to obtain such evidence, which leads to a presumption that such a survey would have shown no likelihood of confusion.  *See*, *e.g.*, *Cairns v. Franklin Mint Co.*, 24 F. Supp. 2d 1013, 1041 (C.D. Cal. 1998) (There is a "presumption that plaintiffs' failure to conduct a survey indicates the results of such a survey would be unfavorable for plaintiffs."); *Scat Enterprises, Inc. v. FCA US LLC*, No. CV 14-7995-R, 2017 WL 5896182, at *3 (C.D. Cal. June 8, 2017) ("Plaintiff's failure to conduct a consumer survey despite having the clear financial means to do so carries with it an inference that the results of such a survey would have been unfavorable to its position.").  That inference is particularly warranted here, where La Canada relied instead on anecdotal, assumption-driven, and numerically d*e minimis* confusion evidence that falls well short of its burden to show confusion among an appreciable number of consumers despite over four years of coexistence.

La Canada's decision to forgo survey evidence and the minuscule confusion rates reflected

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

in its own exhibits confirm that the actual confusion factor does not support the verdict and, when properly weighed, cuts entirely against it.

### b. *The clear weight of the evidence shows that La Canada's md marks are weak, both conceptually and commercially*

The trial evidence overwhelmingly showed that La Canada's asserted MD-formative marks lacked the strength necessary to support the verdict.  Indeed this Court has concluded that the strength of the mark factor as to La Canada's MD mark "weighs against a likelihood of confusion." Dkt. 98 at 8:4-5.  The clear weight of the evidence presented at trial supports this conclusion.  To determine the strength of a mark, courts examine (1) its conceptual strength, evaluating the term's inherent distinguishing potential; and (2) commercial strength, measuring the actual consumer recognition of the mark at the time the mark is asserted in litigation.  *Dermfx, Inc. v. Obagi Med. Prods., Inc.*, No. SACV 15–01999 JVS (DFMX), 2017 WL 2684548, at *5 (C.D. Cal. Mar. 24, 2017).

The reality is that "MD" means "doctor of medicine" or "medical doctor." Notwithstanding Dr. Lin's belabored testimony to the contrary, this Court has noted this common definition multiple times, including that "the term 'MD' is commonly used in cosmetic preparations [and] doctors are frequently involved in the creation of skincare and haircare products, as evidenced by the crowded field of products with the similar MD root form."  Dkt. 55:10-12; Dkt. 98:4-19.  The jury was presented with the USPTO's dictionary-based definition of "MD" as "medical doctor."  Dr. Lin herself ultimately had to admit that the USPTO refused registration of MD HAIR RESTORATION SYSTEM because "MD is an abbreviation for medical doctor" and, in that context, merely described a feature or characteristic of goods provided or developed by a medical doctor.  Tr. at 202:8-203:15; EX2201.

That conclusion was reinforced by the undisputed evidence of a crowded field.  This Court took judicial notice of sixty-five live third-party MD-formative trademark registrations covering hair care products, many of which predated La Canada's asserted rights.[6]  MDalgorithms also

---

[6] These registrations alone constitute "powerful" evidence that the MD designation is weak, even

LAW OFFICES

SIDEMAN & BANCROFT LLP

ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

presented evidence that many such marks were not merely registered but actively used in commerce on live websites marketing MD-branded personal-care and hair-care products. Tr. at 369:21-370:2, 371:2-11; EX2116, 1-65.[7] Under settled law, that sort of widespread third-party use confirms that the shared element is common in the industry and therefore less likely to function as a unique source identifier. *M2 Software*, 421 F.3d at 1088 ("[U]se of similar marks by third-party companies in the relevant industry weakens the mark at issue."); *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1144 (9th Cir. 2002); *Miss World (UK) Ltd. v. Mrs. Am. Pageants, Inc.*, 856 F.2d 1445, 1449 (9th Cir. 1988). It would be a miscarriage of justice to find that La Canada possessed broad or exclusive rights in "MD" for hair care products.

The clear weight of the evidence also showed a fatal absence of proof of commercial strength. Commercial strength turns on marketplace recognition, including advertising tied to the mark, sales success, consumer recognition, survey evidence, or comparable proof that the mark has achieved source significance in the minds of consumers. *Rearden LLC v. Rearden Com., Inc.*, 683 F.3d 1190, 1211 (9th Cir. 2012). La Canada offered none of that. It presented no product-specific advertising figures for the asserted MD marks (including for its claimed unregistered marks MD Hair, MD Nutri Hair and MD Nutri Hair by Susan F. Lin M.D.), no sales data showing market penetration attributable to those marks, no survey evidence, and no expert testimony establishing that consumers recognize "MD" or La Canada's MD-formative marks as indicators of a single source, or that such recognition was actually in effect <u>in late 2021</u> when MDalgorithms introduced MDhair. Dkt. 202 at 26-27 (instructing the jury to consider "how much marketplace recognition the mark has," to be "determined by actual marketplace recognition, which includes advertising expenditures and number of sales"). Indeed, as discussed in § IV(B)(1), *supra*, La

---

without separate evidentiary substantiation that each of those third party marks is in use in commerce. *Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. KGAA v. New Millennium Sports, S.L.U.*, 797 F.3d 1363, 1374 (Fed. Cir. 2015); *Juice Generation, Inc. v. GS Enters. LLC*, 794 F.3d 1334, 1338 (Fed. Cir. 2015).

[7] Beyond what MDalgorithms showed the jury during live testimony, the Court can (and should) further take judicial notice of the scores of other live websites marketing MD-branded hair care and personal care products at common law that MDalgorithms has submitted. *See* Dkt. 163-1, Ex. B; *Threshold Enters. Ltd. v. Pressed Juicery, Inc.*, 445 F. Supp. 3d 139, 146 (N.D. Cal. 2020).

MDALGORITHMS, INC.'S RULE 59 MOTION FOR NEW TRIAL OR TO AMEND JUDGMENT

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

Canada's trial presentation focused instead on <u>MDalgorithms'</u> investors, marketing expenditures and marketplace presence—elements relevant to <u>reverse</u> confusion, which by definition concedes the absence of commercial strength of the senior user.

The submitted (and absent) evidence confirms that the MD marks are fatally weak, conceptually and commercially. The strength of the mark factor therefore cannot support a finding of likelihood of confusion, and supports a new trial or modified judgment.

> ### c. *The clear weight of the evidence does not support an inference of intent to copy*

The relevant inquiry here is whether the defendant adopted its mark with an intent to confuse consumers or capitalize on the plaintiff's goodwill—not merely whether it knew of another mark or selected similar terminology. *See Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1153 (9th Cir. 2011); *E & J Gallo v. Proximo Spirits, Inc.,* 2012 WL 273076, at *19 (E.D. Cal. Jan. 30, 2012).

La Canada failed to present any such evidence at trial. This Court already recognized that La Canada has not adduced any evidence that MDalgorithms adopted the MDhair mark with an intent to confuse consumers or capitalize on La Canada's goodwill, which MDalgorithms' principals confirmed through their testimony at trial. Dkt. 55 at 14:1-7; Tr. 316:6-16, 317:1-5. There was no evidence at trial that MDalgorithms adopted the MDhair mark to capitalize on La Canada's claimed goodwill (and no evidence was presented to the contrary), and such acts would be wholly inconsistent with La Canada's reverse confusion arguments.

> ### d. *The clear weight of the evidence showed that the relevant consumers do not purchase these products on impulse*

It is well-settled in the Ninth Circuit that consumers of prestige hair care products like those here are sophisticated and discerning. *Redken Lab'ys, Inc. v. Clairol, Inc.*, 501 F.2d 1403, 1405 (9th Cir. 1974) ("Consumers who purchase these products learn of necessity to distinguish between many products designed for application to human hair."); *Moroccanoil, Inc. v. Moroccan Gold, LLC*, 590 F. Supp. 2d 1271, 1280 (C.D. Cal. 2008); *His & Her Corp. v. Shake>>N-Go Fashion Inc.*, No. 211CV05323CASVBKX, 2015 WL 13604255, at *11 (C.D. Cal. Apr. 6, 2015)

LAW OFFICES

SIDEMAN & BANCROFT LLP

ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

MDALGORITHMS, INC.'S RULE 59 MOTION FOR NEW TRIAL OR TO AMEND JUDGMENT

(collecting cases); Dkt. 98 at 9:6-13.

The clear weight of the evidence shows that the products at issue are not purchased on an impulse basis or without meaningful consumer care. Many of MDalgorithms' MDhair products are often medicated and sold through a customized diagnostic process, not as ordinary off-the-shelf goods. Tr. 364:17-365:25; EX2034. A purchasing process involving an intake questionnaire, image upload, and personalized assessment reflects deliberation, not impulse.

Nor did La Canada offer contrary evidence that consumers buy either party's products casually or with minimal attention. These are specialized products for highly personal conditions, making confusion less likely. Properly weighed, the degree-of-care factor favors MDalgorithms, consistent with the Court's MPSJ Order. Dkt. 98, 9:7-13.

        **e.**       ***The clear weight of the evidence shows that the similarity-of-the-marks, similarity of the goods, marketing channels and likelihood of expansion of product lines factors do not favor confusion***

The clear weight of the evidence does not support a finding in favor of La Canada as to the Sleekcraft factors concerning similarity of the marks, similarity of the goods, or the marketing channels, or expansion of product lines. As explained in more detail in MDalgorithms' Motion for JMOL, §§ IV(A)(2)(e)-(g), these factors are neutral at best and cannot offset the clear weakness of La Canada's evidence on the factors that meaningfully bear on the likelihood of confusion. These factors provide no basis to support a verdict in favor of La Canada.

      **B.**      **The Willfulness Verdict Is Against the Clear Weight of the Evidence**

There was no evidence presented at trial that MDalgorithms adopted its MDhair mark with a deliberate intent to deceive consumers, to copy La Canada, or to trade on La Canada's goodwill, as La Canada conceded by pushing a reverse confusion case. At most, the evidence showed that MDalgorithms added an MDhair product line as a natural extension to its existing MDacne product line, resulting in a bona fide dispute in a crowded marketplace over a weak, widely used term. That is not willful infringement.

"Willful infringement carries a connotation of deliberate intent to deceive. Courts generally apply forceful labels such as 'deliberate,' 'false,' 'misleading,' or 'fraudulent' to conduct that meets this standard." *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1406 (9th Cir.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

MDALGORITHMS, INC.'S RULE 59 MOTION FOR NEW TRIAL OR TO AMEND JUDGMENT

1993).  Knowing use of a mark in the belief that there is no likelihood of confusion does not constitute willful infringement.  *Id.* (citing *Nalpac, Ltd. v. Corning Glass Works*, 784 F.2d 752, 755 (6th Cir. 1986)).  Willfulness requires a showing of bad faith.  *Id.*

*Lindy Pen* is instructive.  There, the Ninth Circuit upheld the district court's holding of no willful infringement where the plaintiff's mark was weak and the defendant was not trading on the plaintiff's relatively obscure name.  *Id.*  That reasoning maps here.  The trial evidence confirmed that La Canada's asserted MD-formative marks are weak; the marketplace is saturated with other MD-formative uses; and La Canada presented zero evidence that MDalgorithms intended to exploit La Canada's goodwill rather than simply use a common, descriptive industry term.  There was no evidence of bad faith by MDalgorithms.

Indeed, the evidence pointed the other way.  As discussed in § IV(B)(2), *supra*, La Canada failed to present evidence from which a reasonable jury could find intent to copy, even putting aside its reverse confusion arguments.  The evidence showed that "MD" is commonly understood to mean "medical doctor," that there were 65 third-party MD-formative registrations for hair-care goods, and that Dr. Lin acknowledged the USPTO refusal evidence stating that "MD" is an abbreviation for "medical doctor."  Tr. 200:11-203:21; EX2116, 1-65.  The record also showed that the USPTO granted registrations to MDalgorithms for its MDacne and MDhair marks (for software for the latter, while finding it descriptive for the actual products), based on an open and public trademark-filing process by MDalgorithms, further underscoring MDalgorithms' good faith and reasonable belief that it was entitled to adopt and use those marks.  PX-1065; PX-1066.  In such a crowded and weak field, it is not reasonable to conclude that MDalgorithms lacked a good faith belief in its right to use an MD-formative mark for its physician-linked, medically-oriented hair products.  The law does not permit a willfulness finding based on use of a term the record showed was already widely used in the relevant market.  *See Lindy Pen*, 982 F.2d at 1406.

Nor was there any evidence that MDalgorithms was attempting to appropriate the value of some exclusive brand identity inured to La Canada.  La Canada was not the first user or first registrant of MD-formative marks for the relevant goods.  The evidence showed La Canada has never been the exclusive user or registrant of MD-formative marks in the personal care industry.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

That matters.  A defendant cannot reasonably be found to have willfully traded on a plaintiff's supposed brand exclusivity where the marketplace itself refutes the premise that the plaintiff enjoyed exclusivity at all.  Just as the *Lindy Pen* court found no willfulness where the plaintiff's mark was weak and the defendant was not trading on an established, distinctive mark, it would be a miscarriage of justice to conclude that MDalgorithms acted with deliberate intent to exploit La Canada's claimed goodwill in the term "MD."  *Lindy Pen* 982 F.2d at 1406.

This was not a counterfeiting case, or a passing-off case, or a case involving deliberate exploitation of a strong, established mark.  The clear weight of the evidence does not support a verdict of willful infringement, especially where La Canada argued reverse confusion.  A new trial is warranted, or the judgment should be modified to find no willful infringement.

**C.    The Damages Award Is Excessive, Against the Clear Weight of the Evidence, and Cannot Stand Under Rule 59**

**1.    The $1.9 Million Damages Award Cannot Be Reconciled With the Court's Instruction Not to Overcompensate**

The evidence warrants  new trial or modification of judgment because the $1.9 million damages award is contrary to the clear weight of the evidence and cannot be reconciled with the Court's instructions.  The jury was expressly instructed that, when considering prospective costs such as <u>future</u> advertising expenses or the expense of preventing customers from being deceived, it "must not overcompensate" and that any such award "should not exceed the <u>actual damage</u> to the value of the Plaintiff's mark at the time of the infringement by the Defendant."  Dkt. 202 at 30.  Yet the verdict did exactly that.

La Canada's only evidence of actual damage was its (impeached) expert's calculation of $33,105 in purported lost profits for 2023 and 2024, with zero lost profits for 2022, 2025, or any future period. Tr. 528:13-23.  Thus, even crediting La Canada's damages case at face value (which the Court has a duty not to do), the record showed only a small, finite amount of claimed harm and no evidence of ongoing or future economic loss.  An award nearly <u>sixty times greater</u> than that figure cannot be squared with either the proof or the Court's instruction not to overcompensate.

Allowing such an award would be a miscarriage of justice.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

MDALGORITHMS, INC.'S RULE 59 MOTION FOR NEW TRIAL OR TO AMEND JUDGMENT

### 2.    Any Damages Award Based on Alleged Injury to La Canada's Unregistered Marks Was Speculative and Unsupported

The evidence also warrants a new trial because any damages award predicated on alleged injury to La Canada's unregistered marks was speculative and wholly unsupported by the trial evidence.  The jury awarded La Canada $1,140,000 for purported infringement of La Canada's unregistered trademarks, without any showing of evidence from La Canada as to such common law trademark rights, and in direct violation of the law.  Section 43(a) of the Lanham Act (15 U.S.C. §1125(a)) permits claims based on unregistered marks in certain circumstances, but Section 35(a) permits recovery only for compensable injury actually sustained.  *See* 15 U.S.C. § 1117(a)(2) (tying recovery to "damages sustained by the plaintiff").[8]  The statute does not authorize a jury to speculate about abstract harm untethered to proof.

That evidentiary failure is dispositive here.  La Canada presented zero evidence quantifying any loss in goodwill, any decline in consumer recognition, any diminution in mark value, or any other injury to the supposed commercial value of its unregistered marks, or that it even had such common law trademark rights.  To establish common law trademark rights, La Canada needed to prove both that it was "the first to use the [MD] mark in commence to designate the products in a particular geographic area," and that it has established "legally sufficient market penetration" in that geographic area.  *Antiaging Inst. of California, Inc. v. Solonova, LLC*, No. CV1503416ABFFMX, 2016 WL 6916817, at *3 (C.D. Cal. Sept. 21, 2016) (emphasis added). "Market penetration" is proven through (1) the volume of sales with regard to the product at issue; (2) the growth trends of the product both positive and negative; (3) the number of persons actually purchasing the pertinent product in relation to the total number of potential customers; and (4) the amount of advertising with the regard to the product at issue.  *Hanginout, Inc. v. Google, Inc.*, 54 F. Supp. 3d 1109, 1121 (S.D. Cal. 2014) (citing *Adray v. Adry-Mart, Inc.*, 76 F.3d 984, 989 (9th Cir. 1995)).  La Canada did none of that.  Its evidence did not establish that it was the "first" user of MD-formative marks in any geographic area—indeed, the evidence showed that La Canada was

---

[8] Although the statute also permits disgorgement of profits, that issue is for the Court sitting in equity, not the jury, and thus cannot supply a basis for the jury's damages award here.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

MDALGORITHMS, INC.'S RULE 59 MOTION FOR NEW TRIAL OR TO AMEND JUDGMENT

not the first user of MD marks in <u>any</u> geographic area.  And La Canada did not proffer any evidence demonstrating legally-sufficient market penetration in any geographic area.

Instead, La Canada relied on generalized assertions about advertising spend and business activity, without any evidence tying those facts to common law trademark rights in the marks at issue, or a measurable reduction in the value of any unregistered mark.  Nor did La Canada offer survey evidence, expert testimony, financial analysis, or any other competent proof showing that it had such common law trademark rights <u>and</u> that it had suffered cognizable marketplace injury.

Accordingly, because the damages verdict rests significantly on an evidentiary void, it is against the clear weight of the evidence and cannot stand under Rule 59.

### D.    La Canada's Inequitable Conduct Further Demonstrates That Allowing the Verdict to Stand Would Work a Miscarriage of Justice

Unclean hands is a complete defense to trademark infringement.  *Japan Telecom, Inc. v. Japan Telecom Am. Inc.*, 287 F.3d 866, 870 (9th Cir. 2002).  As such, La Canada's own conduct provides an independent reason warranting Rule 59 relief.  The trial evidence showed that, <u>after</u> learning of MDalgorithms' MDhair and MDacne products, La Canada affirmatively incorporated those exact terms into its own digital strategy by purchasing and redirecting domain names designed to capture consumers searching for MDalgorithms' products, including <mdhair.com> and <mdacne.net>.  The evidence showed that the majority (68%) of the limited instances of purported "actual confusion" occurred while La Canada was actively redirecting <mdhair.com> traffic to itself, all while it realized no increase in sales revenue over that 17-month period.

As Peter Kent testified:  "[i]f it's a brand they know, there's often an assumption that there's an associated domain name.  And that domain name is typically '.com.'"  Tr. at 601:3-5.  And here, as conceded by La Canada's claim that MDalgorithms was "flooding the market" with its advertising, the brand that was "known" was MDhair.

Dr. Lin's testimonial inconsistencies regarding <mdacne.net> fully support the unclean hands defense.  As discussed above, she testified at trial that La Canada acquired <mdacne.net> in 2023 after GoDaddy allegedly "approached" her about purchasing it, that she approved the acquisition because she was "trying to save [her] brand," and then redirected the domain to La

LAW OFFICES

SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

MDALGORITHMS, INC.'S RULE 59 MOTION FOR NEW TRIAL OR TO AMEND JUDGMENT

Canada's own website.  179:9-180:4.  But that account could not be squared with her deposition testimony, in which she stated that she had owned <mdacne.net> for between five and ten years and that it did not redirect to La Canada's website.  Boyd Decl. ¶ 4, Ex. B, at p. 92:16-93:13.  Her tale was also demonstrably questionable (at best) regarding GoDaddy "approaching" her to "see if she wanted to purchase" <mdacne.net>.  MDalgorithms' digital-marketing expert testified that GoDaddy does not simply "approach" consumers to sell them domain names and, in his decades of experience as an internet expert, years of using GoDaddy himself, and as the registrant of dozens of domain names, he has never heard of GoDaddy doing such a thing.  Tr. 604:7-15.

Dr. Lin's testimony as to <mdhair.com> and <mdacne.net> was materially inconsistent and not credible.  The Court can and should make its own assessment as to what actually motivated the acquisition and redirection of these domain names, confirming that La Canada's conduct materially undermined the fairness of the verdict.  Trademark law does not permit a plaintiff to claim confusion while simultaneously engaging in marketplace conduct that creates, amplifies, or exploits that very confusion.  *Perfumebay.com Inc. v. eBay, Inc.*, 506 F.3d 1165, 1177 (9th Cir. 2007).  And this was not a case in which confusion arose organically from ordinary marketplace conditions, but one in which La Canada altered its status quo after filing suit, provided at best inconsistent testimony about why it did so, and then pointed to the resulting consumer inquiries as evidence of infringement and harm.

This inequitable conduct reinforces that the verdict is contrary to the weight of the evidence and that allowing it to stand would work a miscarriage of justice.  For that additional reason, the Court should grant a new trial under Rule 59(a) or otherwise alter the judgment under Rule 59(e) to prevent La Canada from benefiting from a situation it helped create.

## V.   CONCLUSION

MDalgorithms respectfully requests that the Court grant a new trial under Rule 59, vacate the jury's liability and damages verdict, and award any further relief necessary to prevent a miscarriage of justice. At minimum, the Court should grant a new trial on damages or alter the judgment to vacate or reduce the $1.9 million award because it is excessive, against the clear weight of the evidence, and inconsistent with the Court's instructions and the trial record.

DATED: April 2, 2026

Respectfully submitted,

SIDEMAN & BANCROFT LLP

By: _____/s/ Ian K. Boyd_____
Ian K. Boyd
Ellen V. Leonida
Andrew M. Levad
*Attorneys for Defendant and Counterclaimant*
*MDalgorithms, Inc.*

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711