United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LA CANADA VENTURES, INC.,

Plaintiff,

v.

MDALGORITHMS, INC.,

Defendant.

Case No.  22-cv-07197-RS

**ORDER GRANTING IN PART AND
DENYING IN PART THE PARTIES'
POST-TRIAL MOTIONS**

Plaintiff La Canada Ventures is a health and beauty company that markets its products under a variety of trademarks that begin with "MD." La Canada sued MDalgorithms, another health and beauty company, averring that MDalgorithms infringed on its trademarks by offering its signature hair regrowth solution under the name "MDhair." La Canada tried its claims to a jury, and it won. The jury found that MDalgorithms infringed one or more of La Canada's registered trademarks and one or more of La Canada's unregistered trademarks. It awarded La Canada $1,900,000 in actual damages.

The parties now move for various forms of post-trial relief. La Canada asks for a permanent injunction, enhanced damages, disgorgement of profits, judgement on partial findings on two of MDalgorithms' counterclaims, and attorney's fees. MDalgorithms has renewed its motion for judgment as a matter of law on the trademark infringement claims and has moved for a new trial.

Though a jury verdict is never lightly set aside, this one must be—at least in large part. There is a reasonable evidentiary basis for the jury's liability finding, but there is not one for the

bulk of its damages award. The evidence supports a maximum damages award of $33,205, not $1.9 million. Therefore, MDalgorithms' motion for judgment as a matter of law is granted in part. Its motion for a new trial as to liability is denied, and its motion for a new trial as to damages is conditionally granted for the same reasons its motion for judgment as a matter of law as to damages is granted. *See* Fed. R. Civ. P. 50(c)(1). All of La Canada's motions are denied, save one. Its motion for judgment on partial findings as to MDalgorithms' eighth and ninth counterclaims— both for unfair competition—is granted because MDalgorithms conceded that it suffered no competitive injury.

### I. BACKGROUND

This is a trademark infringement case contested between two purveyors of health and beauty products. The first is La Canada Ventures, Inc. La Canada, which was founded by Dr. Susan Lin, began offering health and beauty products under marks beginning with "MD" in 2006. Several of those marks were registered with the USPTO by Dr. Lin and subsequently assigned to La Canada. La Canada has also offered products using various unregistered trademarks since as early as 2007.

The second is MDalgorithms. Founded roughly a decade ago, MDalgorithms uses algorithmic techniques to customize health and wellness solutions for its customers. Beginning in 2021, MDalgorithms began to offer a hair restoration solution under the name MDhair. Between January 2022 and August 2025, MDalgorithms distributed more than 290,000 shipments of MDhair to consumers within the United States.

This dispute began in April 2022, when a customer contacted La Canada about MDhair. La Canada sent a cease-and-desist letter to MDalgorithms, demanding that it stop using the MDhair mark because it was causing confusion in the marketplace. MDalgorithms refused, so La Canada filed this lawsuit. La Canada claimed that MDalgorithms' decision to brand its haircare solution MDhair violated La Canada's trademark rights under the Lanham Act and analogous California

United States District Court
Northern District of California

unfair competition law.[1] *See* 15 U.S.C. § 1114; *Cleary v. News Corp.*, 30 F.3d 1255, 1262–63 (9th Cir. 1994) (explaining that "actions pursuant to California Business and Professions Code § 17200 are 'substantially congruent' to claims made under the Lanham Act" (quoting *Academy of Motion Picture Arts & Sciences v. Creative House Promotions, Inc.,* 944 F.2d 1446, 1457 (9th Cir. 1991))). La Canada invoked the protection of seven registered trademarks: MD, MD 101, MD Lash Factor, MD Intimate Restore, MD by Susan F. Lin, M.D., MD Wellness by Susan F. Lin M.D., and MD Factor. It also invoked the protection of two unregistered trademarks: MD NUTRI HAIR and MD HAIR.

To succeed in its trademark infringement claims, La Canada had to show three basic things: (1) that the asserted marks are valid and protectible, (2) that it owned those trademarks, and (3) that MDalgorithms used marks similar or identical to La Canada's marks in a manner likely to cause confusion among consumers. *See Lerner & Rowe PC v. Brown Engstrand & Shely LLC*, 119 F.4th 711, 718 (9th Cir. 2024). Because La Canada claimed ownership to registered and unregistered trademarks, it sought to prove validity in two ways. As to the former marks, it asserted that validity and protectability were established by the registration itself. As to the latter marks, La Canada argued that the marks are "suggestive." That is, because they start with "MD," they imply a characteristic or quality about the product in the minds of consumers: namely, that La Canada's products are medical-grade solutions created by a physician. Suggestive marks are "inherently distinctive," making them valid and protectible. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992). In the alternative, La Canada posited that its marks had acquired a "secondary meaning" among consumers in the health and beauty space. Said otherwise, even if the marks were generic in a vacuum, customers came to associate marks beginning with "MD" with La Canada through years of consistent use.

To show ownership, La Canada had to demonstrate that it began to use the marks in

---

[1] La Canada also brought trademark infringement claims related to MDalgorithms' skincare solution, MDacne. Summary judgment was granted as to those claims in favor of MDalgorithms.

ORDER GRANTING IN PART AND DENYING IN PART POST-TRIAL MOTIONS
CASE NO. 22-cv-07197-RS

United States District Court
Northern District of California

commerce before MDalgorithms began to use its allegedly infringing marks. It offered the testimony of Dr. Lin, who explained that La Canada developed the product offered under one of the registered marks, MD Lash Factor, as early as 2007. She went on to testify that by 2013 at the latest—still several years before MDalgorithms was founded—La Canada was selling a shampoo and conditioning product using the mark MD HAIR.

The final element has two component parts. First, the plaintiff must show that the defendant used marks similar or identical to its marks. That was not a tall order here. As explained, MDalgorithms offered a hair restoration product under the mark MDhair. That differs from La Canada's MD HAIR mark only in that the former does not contain a space and uses lower case letters for the word "hair."[2] For good measure, La Canada's MD NUTRI HAIR mark differs from MDhair as does MD HAIR plus it contains one extra word: NUTRI.

The second component requires the plaintiff to show that the alleged infringement was likely to cause confusion in the marketplace. The nature of the confusion turns on the plaintiff's theory of the case. Here, La Canada advanced a theory of forward confusion. In a paradigmatic forward confusion case, "the well-known mark goes after a look-alike, sound-alike, feel-alike unknown which is trying to cash in on the famous mark's goodwill." *Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1128 (9th Cir. 1998). Imagine that an upstart retailer starts to sell luxury goods under the mark Hermène, complete with orange-accented advertising centered around equestrian imagery. Hermès—the well-known French luxury brand that advertises its goods in much the same way—could state a strong forward confusion claim because consumers of luxury goods might reasonably look at Hermène's products and conclude they come from, are sponsored by, or are in some way affiliated with Hermès.

That means, here, La Canada bore the burden of demonstrating that MDalgorithms' use of

---

[2] It is somewhat unclear from the record whether La Canada's mark is "MD HAIR" or "MD Hair." La Canada's papers use the capitalized version, but its public-facing website uses the lower-case version. Regardless, the jury was permitted to conclude that MDalgorithms' "MDhair" mark was similar to either.

United States District Court
Northern District of California

the MDhair mark was likely to confuse consumers into thinking that La Canada was the source of MDhair. The Ninth Circuit has provided a list of eight factors to be assessed in determining the likelihood of confusion between related goods, *see AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979), but the relative contribution of each factor to the analysis will depend on the facts of each case, *see Marketquest Grp., Inc. v. BIC Corp.*, 862 F.3d 927, 934 (9th Cir. 2017) ("The *Sleekcraft* 'analysis is pliant, illustrative rather than exhaustive, and best understood as simply providing helpful guideposts.'" (quoting *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1030 (9th Cir. 2010))). They are:

>    (1) strength of the mark;
>
>    (2) proximity of the goods;
>
>    (3) similarity of the marks;
>
>    (4) evidence of actual confusion;
>
>    (5) market channels used;
>
>    (6) type of goods and the degree of care likely to be exercised by the purchaser;
>
>    (7) defendant's intent in selecting the mark; and
>
>    (8) likelihood of expansion of the product lines.

*Sleekcraft*, 599 F.2d at 348–49 (hereafter, the "*Sleekcraft* factors"). La Canada packaged those factors into two arguments. First, it claimed that consumers were likely to be confused as to the origin of MDhair because La Canada and MDalgorithms used exceedingly similar marks, targeted the same customers, and both sold their products over the internet.

Second, it claimed to have evidence of significant *actual* confusion. To be clear, a trademark infringement plaintiff need not prove that confusion actually occurred. Rather, evidence of actual confusion is probative of the fact that the defendant's use of the mark was *of a kind* likely to create confusion among consumers, which is all that is legally relevant. La Canada presented its evidence of actual confusion through its sole employee, Cassandra Havea. Havea has been employed at La Canada since 2007, and one of her responsibilities is to monitor communications from customers. She testified that, in April 2022, she received an email from someone about

ORDER GRANTING IN PART AND DENYING IN PART POST-TRIAL MOTIONS
CASE NO. 22-cv-07197-RS

United States District Court
Northern District of California

MDhair—the MDalgorithms product. These emails continued until two days before she took the stand.

Some of these errant inquiries were manifestly made by MDalgorithms customers. For instance, one customer sent Havea proof of payment on MDhair.co, which is the domain through which MDalgorithms sells MDhair. Others took some inference. In one case, a customer called Havea but was unable to provide an order number. She then asked the customer what the color of the product was and he answered "blue bottle." That was enough, in her telling, to deduce that inquiry was coming from an MDalgorithms customer because MDalgorithms offers MDhair in a blue bottle.

In still other cases, there was no evidence at all that the inquiry was from an MDalgorithms customer. Havea testified that if she received a communication from someone who was not known as a La Canada customer, she *assumed* that person was an MDalgorithms customer that was confused about the source of MDhair. For example, one customer contacted La Canada and simply said he had not received his parcel. Havea admitted that the message did not mention MDhair or MDalgorithms, but she nonetheless concluded that he must have been an MDalgorithms customer because "when you put [in] the customer name, they never order[ed] from La Canada." Tr. 288:2–4. In another marked as an instance of actual confusion, the customer simply said "hi." Tr. 285:1–9. Even more confusingly, Havea assumed that some individuals that contacted La Canada were MDalgorithms customers even if there was evidence that they had previously been La Canada customers. In one case, Havea testified that she marked an individual that complained about not getting a package as an MDalgorithms customer even though he had "been a La Canada customer for over two years." Tr. 292:13–20. In all, Havea logged 377 instances of actual confusion, but in only 73 of those instances was there some indication that the communication was coming from an MDalgorithms customer.

MDalgorithms moved for judgement as a matter of law after the close of La Canada's case-in-chief. *See* Fed. R. Civ. P. 50(a). MDalgorithms' headline argument was that no reasonable juror could find for La Canada on its trademark infringement claims because the *Sleekcraft* factors

ORDER GRANTING IN PART AND DENYING IN PART POST-TRIAL MOTIONS
CASE NO. 22-cv-07197-RS

6

weighed decisively against La Canada. MDalgorithms also argued that equity barred recovery because La Canada facilitated any confusion by employing search engine optimization and domain redirection techniques that sent consumers looking for MDalgorithms to La Canada's website. MDalgorithms' motion was denied subject to renewal after the verdict, but it was close. *See* Tr. 536:24–537:7 ("Court: [I]t's pretty thin for the plaintiffs . . . I don't think there's much there that shows [there was confusion about the source of MDhair].").

The jury found MDalgorithms liable for infringing at least one of La Canada's registered trademarks and liable for infringing at least one of La Canada's unregistered trademarks. It awarded La Canada $760,000 for the former and $1,140,000 for the latter. MDalgorithms timely renewed its motion for judgment as a matter of law, *see* Fed. R. Civ. P. 50(b), and moved for a new trial on the same basis, *see* Fed. R. Civ. P. 59(a)(1)(A). Buoyed by its success before the jury, La Canada filed five post-trial motions of its own: for (1) a permanent injunction, (2) disgorgement of profits, (3) enhanced damages, (4) judgment on partial findings on two of MDalgorithms' counterclaims, (5) and attorney's fees.

## II. DISCUSSION

a.  MDalgorithms' Motions

Under Rule 50(a), a party may move for judgment as a matter of law on any issue on which the opposing party has been fully heard. *See* Fed. R. Civ. P. 50(a). If that motion is denied, the moving party may renew it at the close of evidence. *See* Fed. R. Civ. P. 50(b). The inquiry is identical to that applied in a motion for summary judgment under Rule 56. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). Namely, a motion for judgment as a matter of law may only be granted "if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Winarto v. Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276, 1283 (9th Cir. 2001). In making that assessment, all the evidence must be considered, all inferences must be drawn in favor of the nonmoving party, and no credibility determinations are permitted. *See Reeves*, 530 U.S. at 150. However, as at summary judgment, the nonmoving party cannot defeat a motion for judgment as a matter of law by pointing to a mere scintilla of evidence

that could support a verdict in its favor. *See In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).

Under Rule 59, a new trial may be granted "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Rule 59 does not specify the grounds upon which a new trial will be granted; rather, the district court is "bound by those grounds that have been historically recognized." *Zhang v. Am. Gem Seafoods, Inc.,* 339 F.3d 1020, 1035 (9th Cir. 2003). "Historically recognized grounds include, but are not limited to, claims 'that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving.'" *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quoting *Montgomery Ward & Co. v. Duncan,* 311 U.S. 243, 251 (1940)). The standard for granting a new trial is lower than that for granting judgment as a matter of law. *See Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd*, 762 F.3d 829, 841 (9th Cir. 2014). However, because MDalgorithms advances the same arguments in support of both motions, they are assessed in parallel and addressed separately only where necessary.

i.      The Jury's Liability Verdict

A.  Likelihood of Confusion

MDalgorithms' first argument is that no reasonable juror could have concluded that MDalgorithms' use of the MDhair mark was likely to confuse consumers into thinking MDhair came from La Canada. As explained, the likelihood of confusion between two products is assessed using the *Sleekcraft* factors. *See*, 599 F.2d at 348–49. La Canada leaned most heavily into the fourth factor: evidence of actual confusion. That evidence was presented exclusively through Cassandra Havea, who testified that she cataloged 377 instances of actual confusion between April 2022 and March 2026. However, only 73 of those logged instances came from a verified MDalgorithms customer, and only 41 came from someone within the United States.

MDalgorithms argues that no reasonable juror could have concluded that this was anything more than evidence of de minimis confusion. The evidence revealed that, between late 2021 and

June 2025 (which is not exactly the same period as that covered by Havea's log, though it is close), MDalgorithms shipped 290,000 units of MDhair to consumers within the United States. That produces a confusion rate of 0.13% at the high end (using a total of 377 instances of actual confusion) and 0.014% at the low end (using a total of 41 instances of actual confusion).

In that way, MDalgorithms argues that this case is similar to *Lerner & Rowe PC*. *See* 119 F.4th at 719–21. *Lerner & Rowe PC* involved a dispute between two personal injury law firms, one of which accused the other of infringing on its trademark through "conquesting." *See id.* at 717. Conquesting is when a lesser-known firm purchases its better-known competitor's branded keywords so that customers who search for the better-known firm online see results for the lesser-known firm. *See id.* To show that the conquesting had confused customers, the plaintiff in *Lerner & Rowe PC* presented evidence of 236 phone calls that the defendant received in which the caller identified the plaintiff by name. *See id.* at 719. Google data revealed that, during the relevant period, 109,322 searches for the plaintiff firm showed an advertisement for the defendant firm. *See id.* at 720. "Evidence of 236 instances of actual confusion, therefore, constitute[d] only 0.216% of the total number of users exposed to the challenged advertisements." *Id.*

The district court dismissed that evidence of actual confusion as de minimis at summary judgment, and the Ninth Circuit affirmed. *See* 119 F.4th at 720. Much of the panel's analysis focused on how large and how ascertainable the denominator—that is, the total number of opportunities for confusion—was. It explained that in cases in which the denominator is uncertain, "we see the tip of an iceberg and have no ability to speculate about how much lies below the surface." *Id.* By contrast, when the denominator is known, "no speculation is necessary—we can see the entire iceberg." *Id.* That was the case in *Lerner & Rowe PC*, where the Google data allowed the factfinder to "discern with a high degree of precision the proportion of all consumers who were actually confused." *Id.*

Discerning that precise quotient is much more difficult here. As La Canada points out, the appropriate denominator is only those consumers who encountered both trademarks in the marketplace. Those who never came across La Canada ought not be counted in the calculation

United States District Court
Northern District of California

because they never had an opportunity to be confused. MDalgorithms takes this as some kind of confession: that if only a fraction of MDalgorithms' customers encountered La Canada, there can be no likelihood of forward confusion. That is wrong. What matters is whether *those who do see* both marks are likely to be confused about the source of the junior user's products; there is no requirement that there is perfect overlap between the two company's consumers or that all consumers of the junior user know about the senior user. That is because the actual confusion factor is merely an empirical gauge used to answer the pertinent legal question: whether the junior user used the mark *in a manner* likely to cause confusion among consumers.

Second, the documented instances of actual confusion may underestimate the likelihood of confusion here because they capture only those consumers who were *both* confused *and* had some question about or dissatisfaction with MDhair. Said otherwise, a customer who thought that MDhair was a La Canada product but who had no reason to complain would not show up in the data, even though that person was confused. (How that would bear on damages is a separate question.) To contextualize the instances of actual confusion properly here, the jury would have had to know how many MDhair consumers encountered both MDalgorithms and La Canada *and* wanted to contact the source provider.

In the absence of this context, the jury was permitted to credit the evidence of actual confusion in finding that consumers were likely to be confused about the source of MDhair. The Ninth Circuit allowed as much in *Ironhawk Technologies, Inc. v. Dropbox, Inc.* 2 F.4th 1150, 1165–66 (9th Cir. 2021). There, Ironhawk, which sold a software branded "SmartSync" sued Dropbox, which offered a software suite with a feature called "Smart Sync," on a theory of reverse confusion. *See id.* at 1159–60. To demonstrate a likelihood of confusion, Ironhawk relied in part on evidence of actual confusion. *See id.* at 1165–66. That evidence consisted of the testimony of two individuals: the Ironhawk CEO and a third-party sales representative. *See id.* Both individuals testified that Ironhawk's customers and potential customers were confused—some thought that they already bought Ironhawk's "SmartSync" when they had actually bought the suite that included Dropbox's "Smart Sync"; others asked about the relationship between Ironhawk's

ORDER GRANTING IN PART AND DENYING IN PART POST-TRIAL MOTIONS
CASE NO. 22-cv-07197-RS

10

SmartSync and Dropbox. *See id.* Though the Ninth Circuit expressed some skepticism that the jury would credit this evidence at trial, it permitted it to do so. *See id.* Without any evidence as to the denominator that could render the actual confusion evidence de minimis, the instances of actual confusion were "evidence a reasonable jury could rely on to support a finding of actual confusion or when assessing a likelihood of confusion under the totality of the circumstances." *Id.* at 1166; *see Lerner & Rowe PC*, 119 F.4th at 721 (distinguishing *Ironhawk* on the basis that, there, the panel "weighed individual instances of confusion without the benefit of knowing the total number of opportunities consumers had for confusion"). The jury here exercised the same prerogative.

Nor do the other *Sleekcraft* factors weigh decisively enough in MDalgorithms' favor to require the liability finding to be set aside. The jury was entitled to conclude that the first factor, strength of the mark, supported La Canada. Dr. Lin testified that La Canada has been using a family of MD-formative marks for almost two decades and has spent hundreds of thousands of dollars on advertising, imbuing the marks with substantial commercial strength—or at least the jury could so conclude. MDalgorithms' motion rightly focuses on the countervailing evidence it presented at trial, most notably its recitation of the myriad other marks that use "MD" and the natural association of "MD" with "medical doctor" as opposed to La Canada. Many a jury would have found that evidence demonstrated the marks' lack of conceptual strength. Either this one did not or—much more likely—it decided that it did not outweigh the other factors that pointed in La Canada's direction. That conclusion was reasonable.

The jury could have reasonably concluded that several of the other factors weighed in La Canada's favor too. Factor three asks how similar the marks are. As explained, MDalgorithms' MDhair mark differs from the closest La Canada mark, MD HAIR, only in capitalization and the addition of a space. It further differs from La Canada's MD NUTRI HAIR mark through capitalization, the addition of a space, and an extra word. Factor two asks how similar the goods are. Here, both support hair growth and health. The jury's apparent decision to credit those factors in evaluating the totality of the circumstances was not unreasonable.

United States District Court
Northern District of California

### B.  Willful Infringement

MDalgorithms next argues that there was insufficient evidentiary support for the jury's conclusion that its infringement was willful. Two preliminary points must be made before assessing the merits of this argument. First, a finding of willfulness merely bears on the remedies available to an infringement plaintiff—it is not an element of liability nor a requirement to recover actual damages. *See Romag Fasteners, Inc. v. Fossil, Inc.*, 590 U.S. 212, 219 (2020) (explaining that "a trademark defendant's mental state is a highly important consideration in determining whether an award of profits is appropriate"); *Love v. Associated Newspapers, Ltd.*, 611 F.3d 601, 615 (9th Cir. 2010) (discussing the relationship between willful infringement and an award of attorney's fees). Thus, while willfulness is discussed in the context of MDalgorithms' Rule 50(b) and 59 motions because that is where MDalgorithms raised it, MDalgorithms' argument is best understood as a challenge to La Canada's request for disgorgement and attorney's fees. The adjudication of those requests thus incorporates the analysis in this section.

Second, La Canada argues vigorously that this argument—as well as MDalgorithms' arguments regarding damages and the alleged reverse confusion theory—are procedurally barred because MDalgorithms did not raise either in its original motion for judgment as a matter of law under Rule 50(a). Even if that is true, the merits of those arguments must still be addressed because MDalgorithms raised them all in its Rule 59 motion, and it was under no obligation to make those arguments in its Rule 50(a) motion to preserve them for that purpose. Moreover, for reasons explained below, these arguments do not compel granting either motion, so La Canada suffers no prejudice from considering them in the Rule 50(b) context.

The jury was instructed that willfulness required a showing either that MDalgorithms intended to deceive consumers as to the origins of MDhair or that it was willfully blind to the nature of its conduct. *See Atari Interactive, Inc. v. Redbubble, Inc.,* 546 F. Supp. 3d 883, 886 (N.D. Cal. 2021), *aff'd in part, appeal dismissed in part,* No. 21-17062, 2023 WL 4704891 (9th Cir. July 24, 2023). MDalgorithms' motion focuses exclusively on the first of the two paths to show willfulness, and it largely retreads the grounds on which its objection to the jury's liability

ORDER GRANTING IN PART AND DENYING IN PART POST-TRIAL MOTIONS
CASE NO. 22-cv-07197-RS

United States District Court
Northern District of California

finding is based. That is, MDalgorithms argues that because La Canada's marks were weak and the field was crowded with other MD-formative marks, no reasonable jury could have concluded it intended to copy La Canada's marks.

True or not, that ignores the possibility that MDalgorithms willfully blinded itself to the infringement. Willful blindness contains "two basic requirements: (1) The defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." *Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011). To demonstrate the first element, La Canada points to, among other evidence, MDalgorithms' attempts to purchase the domain mdhair.com. If that domain was in use, MDalgorithms must have known that there was a "high probability," *id.*, that someone was marketing a product under that trademark—or at least a jury could so conclude. Despite that, MDalgorithms' founder, Dr. Harth, admitted that he took no steps to learn who that someone was. *See* Tr. 332:4–6 ("Q: Did you ever come to learn who the owner of the mdhair.com domain name is? A. No."). The jury was entitled to infer that his failure to learn such a basic fact was due to his desire to stay ignorant. The jury's willfulness finding was therefore reasonable.

## C. The Alleged Reverse Confusion Theory

MDalgorithms' next argument in favor of judgment as a matter of law and a new trial is that La Canada improperly framed this as a reverse confusion case. In a case of reverse confusion, a smaller senior user sues a larger junior user on the theory that the latter's infringement confused customers into thinking that the former's products come from the latter. Return briefly to the hypothetical case of Hermès v. Hermène, but now imagine that Hermène entered the market first only for Hermès to show up later and win the hearts of luxury-goods consumers the world over. In that case, Hermène could likely state a strong reverse confusion claim because Hermès's brand power and its infringement might reasonably, but mistakenly, convince consumers that Hermène's products actually come from Hermès. *See Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 630 (9th Cir. 2005) ("[R]everse confusion occurs when consumers dealing with the senior mark holder believe that they are doing business with the junior one."). While some smaller senior users

United States District Court
Northern District of California

might consider themselves lucky to be associated with a prestige brand like Hermès, others may lament the loss of the unique goodwill they tried to cultivate over years in the market. Here, reverse confusion would mean that, as a result of MDalgorithms' infringement, La Canada's customers thought they were dealing with MDalgorithms. La Canada previously tried to advance a reverse confusion theory, but that advance was rebuffed because La Canada did not plead reverse confusion in its complaint.

Without question, some of the evidence and arguments at trial would have been more at home in a reverse confusion case. For example, Ryan Nguyen testified that this was a "David and Goliath situation." Tr. 510:23–511:11. In a forward confusion case, the senior user (La Canada) is typically the "Goliath": It is attempting to stop the plucky junior user from misappropriating its goodwill. In a reverse confusion case, by contrast, the senior user is the "David": It is attempting to protect its goodwill from being overwhelmed by the market power of the junior user (the Goliath). Yet, puzzlingly, Nguyen testified that in his metaphor, La Canada was the David, indicating he thought of this as a reverse confusion case. *See* Tr. 524:8–10.

La Canada also elicited testimony about the magnitude of MDalgorithms' advertising spend in an attempt to persuade the jury that MDalgorithms had "flooded the market" with its infringing mark. *See* Tr. 510:23–511:11 (emphasizing that MDalgorithms spent over $9.2 million to market the products at issue); 725:17–20 (La Canada's closing argument: "What are you supposed to do? How are you supposed to compete with the $9.2 million -- it's not even their money really -- that they're using to flood the market here with an infringing mark."). Flooding the market is, however, precisely what one might expect a reverse confusion plaintiff to allege: that a junior user aggressively marketed its product to become the dominant player, causing consumers to believe that the senior user's product actually came from the junior user. Aggressive advertising spend is of dubious relevance in a forward confusion case, where the whole theory is that the junior user is drafting off the goodwill of the senior user.

However inadvisable these remarks were, they do not compel vacatur of the jury verdict. Most importantly, La Canada did not present any *evidence* of reverse confusion. Their central

United States District Court
Northern District of California

evidence of actual confusion—purported MDalgorithms customers reaching out to La Canada about MDhair—was of actual *forward* confusion. Dr. Lin also testified that she had spent many years building the goodwill of her business and was frustrated that customers came to believe that she produced MDhair. *See* Tr. 163:19–164:10 (discussing the awards La Canada has won); 177:2–4 (expressing frustration that an unhappy MDhair customer was contacting La Canada about being overcharged).

Any residual confusion about La Canada's theory of the case was remedied by the jury instructions, which explained to the jury that it "must consider whether a reasonably prudent consumer in the marketplace is likely to be confused *as to the source of the Defendant's hair care product*." Instruction 19 (emphasis added); *see also* Instruction 20 ("[O]ne factor to consider in determining whether the MDhair trademark used by the Defendant is likely to cause confusion with the Plaintiff's trademarks *as to the source of the Defendant's hair care products* is the strength of the Plaintiff's mark.") (emphasis added). There was no space for the jury to find liability on a reverse confusion theory, so the verdict need not be set aside.

### D.  Unclean Hands

Finally, MDalgorithms asks that the jury verdict be vacated because La Canada acted with unclean hands. "Unclean hands is a defense to a Lanham Act infringement suit." *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.,* 826 F.2d 837, 847 (9th Cir.1987). "To make out an unclean hands defense, a trademark defendant 'must demonstrate that the plaintiff's conduct is inequitable and that the conduct relates to the subject matter of its claims.'" *Japan Telecom, Inc. v. Japan Telecom Am. Inc.*, 287 F.3d 866, 870 (9th Cir. 2002) (quoting *Fuddruckers,* 826 F.2d at 847). "To show that a trademark plaintiff's conduct is inequitable, defendant must show that plaintiff used the trademark to deceive consumers." *Id.*; *see Dollar Sys., Inc. v. Avcar Leasing Sys., Inc.*, 890 F.2d 165, 173 (9th Cir.1989) ("Bad intent is the essence of the defense of unclean hands."). Unclean hands is an equitable defense for the court to decide.

MDalgorithms contends that La Canada engineered the confusion that served as the basis of its lawsuit. It complains specifically that La Canada purchased and redirected two domains—

United States District Court
Northern District of California

mdhair.com and mdacne.net—to La Canada's main website. The majority of the instances of actual confusion presented by La Canada—68%, MDalgorithms says—occurred while these redirects were occurring.

This argument is unpersuasive. First, the relevance of La Canada's choice to obtain and redirect the domain mdacne.net is unclear. The instances of actual confusion that permitted an inference of a likelihood of confusion were all related to MDhair: customers discussing a blue bottle, naming MDhair specifically, describing the solution, or the like. This case is not about MDacne.

Second, MDalgorithms has failed to show that La Canada's redirection of mdhair.com to its website was somehow inequitable. La Canada markets a product called MD HAIR, and it began to do so well before MDalgorithms entered the market. Mdhair.com is a perfectly natural domain from which to offer that product. *See* Tr. 601:3–5 ("If it's a brand they know, there's often an assumption that there's an associated domain. And that domain name is typically .com."). That MDalgorithms may have *also* wished to market its product at that domain (and that it would have made sense for it to do so) does not render La Canada's decision to do so unfair. If anything, La Canada's earlier-in-time development of its product gives it an equitable entitlement to the domain.

Third, La Canada's assertion that 68% of the instances of actual confusion occurred during the period in which these redirects were occurring proves far too little. Dr. Lin testified that she activated MDhair.com and began redirects to La Canada's main website sometime in 2023, after she learned that MDalgorithms was selling its product at mdhair.co in April of that year. *See* Tr. 205:10–21. Cassandra Havea testified that she first received an email from an MDhair customer in April 2022, *see* Tr. 270:8–13, and her log of confused customers goes through January 2026. Therefore, the redirects were up and running for between roughly 55% of the period in which confusion was being tracked (if we assume the redirects started in April 2023, as soon as Dr. Lin learned about mdhair.co) and roughly 73% of the period in which confusion was being tracked (if

ORDER GRANTING IN PART AND DENYING IN PART POST-TRIAL MOTIONS
CASE NO. 22-cv-07197-RS

we assume the redirects started at the end of 2023).[3] It is thus entirely unsurprising that 68% of the instances of actual confusion occurred during the period in which the redirects were occurring. That is roughly what would be expected *if the redirects had no impact on confusion at all*.

In sum, the jury's liability finding was reasonable in light of the evidence, so MDalgorithms' Rule 50(b) motion is denied as to liability. MDalgorithms' motion for a new trial is denied as to liability for the same substantive reasons. Though evidence may be reweighed and credibility assessed in adjudicating a motion for a new trial, Rule 59 is not a license for the district court to substitute its view for the jury's. *See Roy v. Volkswagen of America, Inc.*, 896 F.2d 1174, 1176 ("While the trial court may weigh the evidence and credibility of the witnesses, the court is not justified in granting a new trial "merely because it might have come to a different result from that reached by the jury." (quoting *Wilhelm v. Associated Container Transportation (Australia) Ltd.,* 648 F.2d 1197, 1198 (9th Cir. 1981))). Here, there was certainly evidence that could have supported a finding of no liability, but the jury's liability verdict was nonetheless based on credible evidence (even accounting for the portion of Cassandra Havea's testimony that ought to have been disregarded). The jury's decision to credit particular evidence and make particular inferences did not work a manifest injustice on MDalgorithms, so a new trial on liability is not necessary.

ii.    The Jury's Damages Award

If the jury's liability verdict is not set aside, MDalgorithms requests that the $1.9 million damages award be scaled back. Though the jury did not say so explicitly—because the verdict form did not require it to—the damages award was largely based on a theory of corrective advertising. That theory posits that a trademark infringement plaintiff should be compensated in

---

[3] The math goes like this: there are 45 months between April 2022, and January 2026—the range in which instances of confusion were recorded. There are 33 months between April 2023, and January 2026—the longest plausible period during which the redirects occurred. There are 25 months between December 2023, and January 2026—the shortest plausible period during which the redirects occurred. Thus, the percentage of the period in which instances of confusion were recorded where redirects were also occurring is between 25/45 (55%) and 33/45 (73%).

the amount it will be required to spend on advertising to undo the confusion created by the defendant's infringement. The award here must have been based on corrective advertising because the evidence did not permit a finding that La Canada suffered an injury comparable in size through lost profits or the like. In fact, La Canada's damages expert, Ryan Nguyen, testified that MDalgorithms' infringement cost La Canada a modest $33,205 in lost profits. *See* Tr. 528:13–25; 528:18–20.

MDalgorithms' first objection to this corrective advertising award is trivial. It contends that such an award was not permitted by the jury instructions, which limited prospective costs, including corrective advertising, to "actual damage to the value of the Plaintiff's mark at the time of the infringement by the Defendant." Instruction 23. MDalgorithms' argument, it would seem, limits the term "actual damage" to only the retrospective monetary damage that La Canada suffered. That makes no sense. The portion of instruction 23 that MDalgorithms references deals with *future* costs, and it is nonsensical to say that future costs cannot exceed past economic harm. The better reading is that the instruction prevented the jury from awarding future costs that were meant to overcompensate by, for example, punishing MDalgorithms—as those types of damages are beyond the ambit of "actual damages" as that phrase is typically understood.

Indeed, corrective advertising is a measure of compensatory damages, making them "actual damage[s]." *See Adray v. Adry-Mart, Inc.*, 76 F.3d 984, 989 (9th Cir. 1995), *as amended on denial of reh'g* (Feb. 15, 1996) (describing corrective advertising as "essentially compensatory damages"). That is because the goal is to give the plaintiff the means to put itself back in the position it would have been in absent the violation.

MDalgorithms' better objection is that the quantum of corrective advertising the jury awarded was not supported by the evidence. The most direct evidence came out during the testimony of Dr. Lin, who said that she had a plan to correct the confusion through advertising over four years. *See* Tr. 194:7–13 ("I'm going to spend the next four years to dig my way out of the hole."). She testified that "on average" over the last four years, she (meaning La Canada) spent "about $300,000" on advertising. Tr. 194:15–21.

United States District Court
Northern District of California

She was less certain about how much would be necessary going forward to remedy the confusion. At first, she said her plan was to "spend at least as much as what I normally spend, and if that's not enough . . . spend more." *Id.* She then quickly upped the ante, claiming that she "know[s] at least [she] need[s] to double it," and that if that was not enough to create a response in the market, she would "need to go up" again. Tr. 194:23–24. If La Canada did double its advertising spend, the corrective advertising damages award would be $1,200,000—$300,000 *extra* in spend per year multiplied by four years. *See* Tr. 194:25–195:3.

The only other witness that discussed corrective advertising was Ryan Nguyen. Instead of focusing on La Canada's advertising spend, Nguyen focused on MDalgorithms' advertising spend on the theory that it is reasonable to calculate how much a plaintiff will have to spend to correct confusion by assessing how much the defendant spent creating the confusion. He testified, based on an assessment of MDalgorithms' financial documents, that MDalgorithms spent $9.2 million on advertising between 2022 and June 2025. He then multiplied that number by 25 percent to arrive at a corrective advertising figure of $2.3 million.[4]

The testimony of both Dr. Lin and Nguyen were deeply flawed, and no reasonable jury could have relied on either to deduce a non-speculative corrective advertising award. Dr. Lin's testimony was pure conjecture. She took La Canada's historical spend and said she would have to double it, maybe more. Based on what, exactly, one might wonder? Dr. Lin—nor any other witness—provided any specifics: how much confusion MDalgorithms had generated, what would be necessary to remedy it, and perhaps most importantly, where she came up with "double." A jury is permitted to believe particular witnesses and make reasonable inferences in their favor, but it is not permitted to ratify guesswork.

---

[4] Nguyen also testified that the figure based on Dr. Lin's testimony would have been $2.4 million, which he calculated by multiplying La Canada's annual advertising spend, $300,000, by two (because Dr. Lin said she would double it) and then by four years. *See* Tr. 510:15–22. That math does not take into account La Canada's normal rate of advertising spend. If La Canada will have to spend $600,000 annually but would have spent $300,000 in the normal course, MDalgorithms can only be liable for the additional $300,000, not the full $600,000.

Nguyen's testimony fares no better. Multiplying the defendant's historical advertising spend by 25 percent to estimate the quantum of corrective advertising has pedigree, but it is not axiomatically applied. *See Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365, 1375 (10th Cir. 1977). Nguyen made no attempt to justify the application of that standard in this case—there was no discussion of, for example, the pervasiveness of the confusion, the portion of MDalgorithms' advertising budget that went towards MDhair, or the geographic reach of each company's marketing efforts. He simply got on the stand, said "[i]n my experience, [the 25 percent standard] does apply," and then stepped down. That is not good enough.

The 25 percent "rule" seems especially inappropriate here. Because corrective advertising is a form of compensatory damages, it must reflect the loss of goodwill or reputational damage that the defendant's infringement caused. *Cf. Wag Hotels, Inc. v. Wag Labs, Inc.*, No. 20-CV-01326-BLF, 2023 WL 3605977, at *9 (N.D. Cal. May 22, 2023) (explaining that a plaintiff must present non-speculative evidence of harm to goodwill and reputation to secure a corrective advertising award). La Canada did not avail itself of many of the most conventional methods of showing diminution of goodwill. For example, it did not conduct a survey, which—while absolutely not required in every trademark case—might have shown that customers of hair regeneration products have a less favorable impression of La Canada than they did before the infringement. Nor did it call a marketing expert, who might have been able to testify to the likely brand value loss from MDalgorithms' infringement. In the end, the only proof La Canada offered of loss of goodwill was loss of profits. A loss of $33,205 *over three years* may be something, but it is not much. It certainly does not establish the substantial loss of goodwill that would justify an award of 25 percent of the defendant's advertising spend, especially where the defendant does an order of magnitude more business than does the plaintiff.

La Canada was put on notice in the pretrial motions practice that its attempt to obtain a corrective advertising award would require real legwork. Though MDalgorithms' motion in *limine* to exclude any reference to this theory was denied, it was made clear that "an infringement plaintiff is not automatically entitled to some percentage of defendant's historical advertising

United States District Court
Northern District of California

spend simply because it establishes infringement." Dkt. 175, at 5. La Canada was also told that it "bears the burden of demonstrating that application of [the 25 percent standard] will result in an accurate approximation of what it would have to spend in the future to correct the confusion generated by MDalgorithms' alleged infringement." *Id.*, at 6. It ought to have heeded that admonition.

Ultimately, the record cannot bear the weight of the jury's damages award. The only figure that is consistent with the evidence is the $33,205 in lost profits. The remainder must be set aside.

Under Rule 50(c), a conditional ruling on MDalgorithms' Rule 59 motion is required to the extent its Rule 50(b) motion is granted. Because the threshold for granting a Rule 59 motion is lower than that for a Rule 50(b) motion and because the arguments MDalgorithms advances in support of both motions are the same, the Rule 59 motion is conditionally granted in part for the same reasons the Rule 50 motion is granted in part. If the grant of the Rule 50(b) motion as to damages is subsequently reversed or vacated, a new trial on damages will follow. *See Experience Hendrix, L.L.C. v. Hendrixlicensing.com, Ltd.*, No. C09-285Z, 2011 WL 4402775, at *6 (W.D. Wash. Sept. 21, 2011), *aff'd in part, vacated in part, rev'd in part sub nom. Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd*, 762 F.3d 829 (9th Cir. 2014).

iii.    La Canada's Motions

A.  Permanent Injunction

La Canada first moves for a permanent injunction to prevent MDalgorithms from continuing to use MDhair to market its haircare solution. *See* 15 U.S.C. § 1116(a). "According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

In the Ninth Circuit, injunctions are no longer granted reflexively upon a showing of trademark infringement. *See Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013). Rather, "actual irreparable harm must be demonstrated to obtain a permanent injunction in a trademark infringement action." *Id.* La Canada has failed to do so. La Canada's assertion of prospective irreparable harm is basically: we were harmed in the past, the conduct is ongoing, therefore we will experience harm in the future.

It is a tidy argument, but unfortunately for La Canada it has been squarely rejected by the Ninth Circuit. In *Herb Reed*, a trademark infringement plaintiff moved for a preliminary injunction, and the district court obliged, citing "loss of control over business reputation and damage to goodwill" as irreparable harm. 736 F.3d at 1250. The Ninth Circuit reversed, explaining that those consequences *can* constitute irreparable harm but that the plaintiff bears the burden of demonstrating that they are likely to occur absent injunctive relief. *See id.* There, the plaintiff had failed to do so because all it did was point to evidence of customer confusion. *See id.* (explaining that "an email from a potential customer complaining to Marshak's booking agent that the customer wanted Herb Reed's band rather than another tribute band . . . simply underscores customer confusion, not irreparable harm."). The "practical effect" of the injunction, the panel thus noted, was to "reinsert the now-rejected presumption of irreparable harm based solely on a strong case of trademark infringement." *Id.* at 1251.

The same problem bedevils La Canada's proffer here. It has pointed to evidence that supports a finding of past harm—including customer confusion and testimony about the loss of control over its commercial reputation—but it has not pointed to anything specific about the future. As in *Herb Reed*, its insistence that it will suffer harm in the future because it suffered harm in the past is "grounded in platitudes rather than evidence," and attempts to revive a bygone era of trademark law. 736 F.3d at 1250 ("Gone are the days when '[o]nce the plaintiff in an infringement action has established a likelihood of confusion, it is ordinarily presumed that the plaintiff will suffer irreparable harm if injunctive relief does not issue.'" (quoting *Rodeo Collection, Ltd. v. W. Seventh,* 812 F.2d 1215, 1220 (9th Cir. 1987) (alteration in original))).

United States District Court
Northern District of California

La Canada has also failed to establish that the balance of hardships supports an injunction. As explained, La Canada has suffered relatively minimal economic harm from this infringement, and it has not presented any evidence other than lost profits suggesting that its goodwill has been eroded. Indeed, the only burden La Canada seems sure to bear should infringement continue is having to respond to misdirected inquires. That pales in comparison to the cost of forcing MDalgorithms to rebrand one of its core products.

La Canada's argument as to the public interest is equally unpersuasive. It notes that some customers contacted La Canada regarding problems about MDhair, but it fails to explain why that alone presents a threat to the public interest. Those who contacted La Canada by mistake were rerouted to MDalgorithms, and those who were confused about source of MDhair but never contacted La Canada because they had nothing to complain about suffered no harm from their misapprehension. La Canada's argument—that the public interest is served by an injunction because the jury found that the public was likely to be confused—would seem to apply to every trademark infringement case and thus convert a permanent injunction into a commonplace remedy. The motion is denied.

### B. Disgorgement of Profits

The Lanham Act permits an award of "the defendant's profits" consistent with "principles of equity." 15 U.S.C. § 1117(a). Though willfulness is "a highly important consideration in determining whether an award of profits is appropriate," it is neither necessary nor sufficient to obtaining such an award. *Romag*, 590 U.S. at 219; *see Faberge, Inc. v. Saxony Prods., Inc.*, 605 F.2d 426, 429 (9th Cir. 1979). Rather, the statutory directive to award disgorgement subject to "principles of equity" permits consideration of a broad range of factors, among them (1) diversion of sales; (2) adequacy of the other remedies; (3) delay by the plaintiff in asserting its trademark rights; (4) the public interest in deterring misconduct; (5) whether this is a case of palming off; and (6) whether an award of profits would give plaintiff a windfall. *See Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 554 (5th Cir. 1998); *Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1073 (9th Cir. 2015) (discussing the windfall factor); *Maier Brewing Co. v.*

*Fleischmann Distilling Corp.*, 390 F.2d 117, 121 (9th Cir. 1968) (observing that the Lanham Act "confers a wide scope of discretion upon the district judge in the fashioning of a remedy for a violation of the Act").

Disgorgement is not appropriate in this case. First, La Canada has provided only scant evidence that it competes directly with MDalgorithms, which means that very few, if any, sales have been diverted as a result of the infringement. La Canada attempts to establish direct competition through generic evidence that it has sold products under its MD-formative marks for almost twenty years, but that says nothing about *who it has competed against* during that period. There is no evidence that customers in the market for hair loss solutions regularly encountered both companies and had to decide between the two. To the contrary, MDalgorithms offered evidence that the two companies sold through different sales channels and offered meaningfully different products. While La Canada sells its products on conventional e-commerce like Amazon, MDalgorithms sells MDhair through a dedicated product website. *See* Tr. 337:8–10. Any customer encountering both products would have two very different experiences: to buy La Canada's product a customer just has to click and pay; to buy MDalgorithms', the bulk of customers fill out a survey and undergo an AI-powered image assessment before receiving a custom solution. *See* Tr. 391:21–392:22.

Second, awarding disgorgement would give La Canada a monumental windfall. As already discussed, the evidence supported a damages award of $33,205, yet La Canada is asking for disgorgement of between $1,880,000 and $18,326,503. That range represents, on the low end, a 57x multiplier on La Canada's actual damages and, on the high end, a staggering 592x multiplier. Moreover, La Canada's damages expert, Ryan Nguyen, testified that in 2022, La Canada made $147,000 in revenue, meaning that the requested disgorgement award could keep it going for between 12 and 125 years. That is the definition of a windfall.

Perhaps recognizing the paucity of evidence supporting disgorgement, La Canada stakes much of its argument on the jury's finding that the infringement was willful. Though disgorgement is ultimately an equitable issue, the jury's factual conclusion regarding willfulness is

binding so long as it was reasonable. That said, willfulness exists on a spectrum, and while the evidence here permitted the conclusion that MDalgorithms was willfully blind to its own infringement, *see supra* section II.a.i.B, it did not permit the conclusion that MDalgorithms deliberately intended to capitalize on La Canada's goodwill. La Canada nearly concedes as much, as the discussion of willfulness in its opposition to MDalgorithms' motion for a new trial focuses exclusively on willful blindness. *See* Dkt. 232 at 13–16.

That is rightly so. The only evidence La Canada offered at trial that could plausibly support a finding of straightforward willful infringement was (1) that its marks were conceptually and commercially strong (giving MDalgorithms an incentive to willfully infringe) and (2) correspondence between MDalgorithms and La Canada in which La Canada demanded that MDalgorithms cease infringing (demonstrating that MDalgorithms knew, at some point, what it was doing). The inference required from that evidence that MDalgorithms' goal was to steal La Canada's goodwill is simply too tenuous. Moreover, any jury inclined to make that inference would have had to grapple with the powerful evidence that La Canada did not have very much goodwill to exploit. No doubt, as acknowledged, La Canada had been in business for many years and had some accolades to its name by the time this dispute arose. However, in 2022—right around the time the infringement began—its revenues were a meager $147,000. That same year, MDalgorithms' revenues were north of $10 million, and they grew to more than $17 million the following year. It is simply implausible that MDalgorithms would have deliberately decided to trade on the goodwill of a business generating only about 1.5 percent of the revenue that it was bringing in. That makes MDalgorithms' conduct substantially less nefarious, weakening the case for disgorgement.

The absence of misappropriated goodwill also mitigates the harm to the consuming public, reducing further the need for disgorgement. The Ninth Circuit has explained that the public is injured by trademark infringement because many consumers "are willing to pay substantial premiums for particular items which bear famous trademarks based on their belief that such items are of the same high quality as is traditionally associated with the trademark owner." *Playboy*

ORDER GRANTING IN PART AND DENYING IN PART POST-TRIAL MOTIONS
CASE NO. 22-cv-07197-RS

25

*Enters., Inc. v. Baccarat Clothing Co.*, 692 F.2d 1272, 1275 (9th Cir. 1982). When a trademark is infringed, those consumers are "denied the benefits of their bargains," and a judicial remedy that "will take all the economic incentive out of trademark infringement" becomes necessary. *Id.* Here, by contrast, La Canada has not shown that consumers of hair regrowth products were harmed by MDalgorithms' infringement. Though some consumers may have been confused about the source of MDhair, the evidence does not indicate that those consumers got a markedly worse product or that they paid a higher price for a comparable product. There is thus no particular public interest in crafting a remedy which will deter this conduct going forward. For all these reasons, La Canada's request for disgorgement of profits is denied.

### C.  Enhanced Damages

La Canada next asks for enhanced compensatory damages. The Lanham Act permits an award of damages of "any sum above the amount found as actual damages, not exceeding three times such amount" provided that such an award "shall constitute compensation and not a penalty." 15 U.S.C. § 1117(a).

This request is denied. For reasons already explained, the jury's damages award *overcompensated*, rather than *undercompensated*, La Canada—and it did so in rather spectacular fashion. As previously noted, the only evidence La Canada presented in support of its corrective advertising request were a few unsupported remarks by Dr. Lin about how much would be necessary to fix the confusion MDalgorithms caused and legally erroneous assertions offered by Ryan Nguyen about how corrective advertising works in the Ninth Circuit. The only damages award the evidence supported was equal to the undisputed quantum of lost profits: $33,205.

La Canada's request for enhanced damages must therefore be understood with this reduced award as the baseline. That is, the maximum that can be awarded is three times $33,205, or $99,615 (not $5.7 million, which is three times the original award of $1.9 million). La Canada points to two reasons why the jury's damages award is insufficient to redress the harm it experienced. First, it says the award cannot account for the "long tail of confusion" that will occur after the verdict is returned. Even if the prospect of future harm could serve as the basis for

United States District Court
Northern District of California

enhanced damages now, that prospect must be substantiated by more than just conjecture. La Canada's only evidence of future harm is past harm; it has offered nothing from which to conclude that the problem is likely to persist. If anything, the evidence reveals the opposite. MDalgorithms has experienced substantial revenue growth in recent years, and as its brand power grows, it becomes less and less likely that its customers will buy MDhair thinking that they are purchasing a La Canada product.

Second, La Canada asserts that the best estimate of funds needed for corrective advertising is $2.3 million, which is equal to 25 percent of MDalgorithms' total marketing spend of $9.2 million. Because the jury's corrective advertising award has been vacated, this argument is a non-starter. La Canada not only failed to demonstrate that 25 percent was an appropriate figure to use in this case, it failed to demonstrate the reasonableness of any other figure. La Canada continues to assert that Nguyen's testimony was based on the "Ninth Circuit recognized corrective advertising methodology," Dkt. 229, at 9, which, in fact, does not exist. The appropriate measure of corrective advertising always turns on the facts of each individual case—that 25 percent may be appropriate in one case does not relieve a trademark plaintiff of its obligation to prove *with evidence* that it is also appropriate in its case. La Canada was told as much as far back as the rulings on the motions in *limine*.

### D.  Judgment on Partial Findings on MDalgorithms' Counterclaims Eight and Nine

MDalgorithms brought counterclaims for common law unfair competition (counterclaim eight) and for unfair competition under the California Business & Professions Code (counterclaim nine). Both claims are predicated on the theory that La Canada's decision to redirect consumers who visited mdhair.com to its website was unfair. La Canada moves for judgment on partial findings on those counterclaims under Rule 52.

To maintain a claim for unfair competition under both common law and the California Business & Professions Code, a plaintiff must demonstrate that it was harmed by the challenged conduct. *See Bank of the W. v. Superior Ct.*, 2 Cal. 4th 1254, 1264, 833 P.2d 545, 551 (1992) (observing that the "common law tort of unfair competition . . . required a showing of competitive

injury"); Cal. Bus. & Prof. Code § 17204 (authorizing the bringing of a claim "by a person who has suffered injury in fact and has lost money or property as a result of unfair competition"). MDalgorithms conceded at trial that it suffered no injury as a result of the redirects from mdhair.com. *See* Tr. 625:25–626:4 ("Court: Okay. So you are effectively stipulating it caused no harm? . . . are you going to suggest at some point in this case, either an issue to me or whatever, that you've been damaged by this? A: No."). Though the lack of any harm is the entire basis of La Canada's motion, MDalgorithms fails to address it in its opposition. Accordingly, La Canada's motion is granted.

E.    Attorney's Fees

Finally, La Canada moves for attorney's fees. The Lanham Act permits an award of "reasonable attorney's fees to the prevailing party" in "exceptional cases." 15 U.S.C. § 1117(a). The "exceptional cases" requirement is construed narrowly. *See Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 990 (9th Cir. 2008). An "exceptional case . . . stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *SunEarth, Inc. v. Sun Earth Solar Power Co.*, 839 F.3d 1179, 1180 (9th Cir. 2016) (en banc) (quoting *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014)). Though fee requests are ultimately evaluated using the totality of the circumstances, the Ninth Circuit—drawing on Supreme Court precedent—has identified a list of non-exhaustive factors to be considered, including "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id.* (quoting *Octane Fitness*, 572 U.S. at 1756 n.6).

This is not an exceptional case. First, MDalgorithms' litigating position was substantively strong. Though MDalgorithms did not prevail before the jury, it well could have. The jury could have reasonably concluded that La Canada's evidence of actual confusion was de minimis and that its marks were conceptually and commercially weak. That MDalgorithms succeeded in largely gutting the verdict after trial reveals that its position on damages was meritorious as well.

United States District Court
Northern District of California

United States District Court
Northern District of California

Nor did MDalgorithms litigate this case in an unreasonable manner. MDalgorithms participated diligently in discovery and all other pre-trial matters, competently litigated the case during trial, and has moved for post-trial relief in good faith. La Canada's argument to the contrary focuses on MDalgorithms' assertion of various affirmative defenses and counterclaims, among them that Dr. Lin committed fraud on the USPTO and that La Canada acted with unclean hands. That argument is unpersuasive for at least three reasons. First, to the extent La Canada's contention relies on the failure of MDalgorithms' counterclaims and defenses before the jury, La Canada conflates substantive strength with strategic unreasonableness. A claim is not frivolous simply because it fails. Second, MDalgorithms was not obligated to put on witnesses to substantiate all of its counterclaims and defenses simply because it raised them before trial, and La Canada mistakes its calculated choice not to do so for vexatious strategy. After La Canada rested its case, MDalgorithms moved for judgement as a matter of law under Rule 50(a)—and it almost won. At that point, MDalgorithms may have reasonably thought that it would have been more effective to emphasize, through its own witnesses, the holes in La Canada's case than to spend time building its own counterclaims. A party can, and often must, pivot its strategy as a trial proceeds in response to its perception of the other side's case. Third, in emphasizing MDalgorithms' concession that it suffered no competitive harm from La Canada's domain redirects, La Canada demonstrates a misconstruction of the value of that evidence. MDalgorithms put on Peter Kent as a search engine optimization expert to explain the mechanism and likely effect of the redirects. Even after MDalgorithms had effectively dropped its counterclaims for unfair competition (notwithstanding its present opposition to La Canada's motion for judgment on partial findings as to those counterclaims), MDalgorithms sought to leverage that testimony to prove its equitable defense of unclean hands. In sum, MDalgorithms did not litigate this case in an unreasonable manner. The case is far from exceptional, and an award of attorney's fees is not warranted.

### III. CONCLUSION

For the foregoing reasons, the post-trial motions are resolved as follows. MDalgorithms'

ORDER GRANTING IN PART AND DENYING IN PART POST-TRIAL MOTIONS
CASE No. 22-cv-07197-RS

29

motion for judgment as a matter of law is granted in part and denied in part. The jury's liability verdict is undisturbed, but its damages award is reduced to $33,205. MDalgorithms' motion for a new trial is denied as to liability and conditionally granted as to damages. La Canada's motions for a permanent injunction, for disgorgement, for enhanced damages, and for attorney's fees are denied. Its motion for judgment on partial findings regarding MDalgorithms' eighth and ninth counterclaims is granted.

**IT IS SO ORDERED**.

Dated: June 9, 2026

RICHARD SEEBORG
Chief United States District Judge